(No. 13157.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CHARLES F. EMMEL, Plaintiff in Error.

*Opinion filed April 21, 1920.*

1. CRIMINAL LAW—*definition of confidence game.* The confidence game may be defined as any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler.

2. SAME—*form of transaction is immaterial in practice of confidence game.* In a prosecution for obtaining money or property by means of the confidence game, if the transaction is, in fact, a swindling operation it is immaterial how the confidence has been acquired or that the transaction assumes the form of a lawful contract, if the confidence is used to enable the person in whom it is reposed to obtain the property of his victim and is used with that intent.

3. SAME—*one may be convicted of the confidence game although confidence has been acquired by a long course of honest dealing.* Where one has acquired the confidence of another, whether suddenly and by falsehood or by a long course of honest business dealing, and has made use of that confidence to obtain the other's property with the intention of cheating him out of it, the person so obtaining the property may, under the statute, be convicted of obtaining the property by means of the confidence game.

4. SAME—*mere acceptance of another's property with intent to convert to one's own use does not constitute confidence game.* A trusted agent who, without any action on his part to induce the offer, accepts securities voluntarily offered to him to be collected or sold or to be kept safely, is not guilty of obtaining them by means of the confidence game, even though he may have intended to convert them to his own use if he got them, as he had done nothing to procure them with that purpose in view.

5. SAME—*when instruction as to confidence game is not erroneous.* In a prosecution for obtaining securities by means of the confidence game, an instruction stating that if the jury believe the papers were delivered to the defendant at his request and because of confidence reposed in him and that he "procured" said papers with the purpose and intent of converting them to his own use they should consider such facts in determining his guilt is not erroneous, as the word "procure" implies action on the part of the defendant to bring about the delivery of possession to him.

6. SAME—*in a prosecution for confidence game, evidence may show property was obtained from owner's agent.* In an indictment for the confidence game it is sufficient to allege that the property obtained was either that of the general owner or of the agent in possession, and it is sufficient to prove that the confidence game was practiced either on the owner or the agent.

7. SAME—*what evidence of other transaction is not admissible in prosecution for confidence game.* In a prosecution for obtaining notes and mortgages by means of the confidence game, evidence that the defendant, nearly five years before the finding of the indictment, borrowed money of the same person who is the alleged victim of the confidence game and gave a forged note as collateral security, tends to prove the crime of forgery and is not admissible.

8. SAME—*contradictory instructions should not be given.* Contradictory instructions should not be given, as it cannot be presumed that the jury will know which instruction should be accepted as the law.

WRIT OF ERROR to the Circuit Court of Fayette county; the Hon. THOMAS E. FORD, Judge, presiding.

J. G. BURNSIDE, and F. M. GUINN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, WILL P. WELKER, State's Attorney, and FLOYD E. BRITTON, (JUNE C. SMITH, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Charles F. Emmel was found guilty in the circuit court of Fayette county in manner and form as charged in an indictment which charged him in three counts with obtaining from Lisetta Springer her money and property of the value of $5000 by means of the confidence game. He was sentenced to an indeterminate term of imprisonment in the penitentiary and has sued out a writ of error to reverse the judgment of conviction.

Lisetta Springer was a widow who had lived in Vandalia for thirty-five years. Her husband had conducted a bakery during his lifetime, and after his death she, with her three

children, continued the business. She was possessed of considerable property, which for thirty years or more she was in the habit of investing in notes secured by real estate mortgages. Fred Emmel, the father of the plaintiff in error, had been engaged in the real estate and loan business in Vandalia for more than thirty years, and during that time had loaned and invested Mrs. Springer's funds for her and had practically the management and control of that part of her business, except that she kept the securities in her own possession at home. He collected the interest on her loans and the principal when it came due and made new loans. Whenever he wanted any of her securities he would go to her house for them or send a clerk or his son, the plaintiff in error, and she would deliver the papers. For many years before his death he made all the loans and took all of the mortgages in his real estate business in the name of the plaintiff in error. The plaintiff in error had no interest in the business, except that during a part of the time he was engaged in the abstract business and made the abstracts for his father's loans. He released mortgages upon the margin of the record upon his father's request, having only a formal connection with them, without any interest in or knowledge of them. Fred Emmel, the father, died on March 3, 1917. For about two years he had been confined nearly all the time to his house by sickness, visiting his office only occasionally, and the plaintiff in error had stayed in the office most of the time, transacting such business as was transacted there. He testified that he did not have absolute control of the business and had nothing to do with it except at his father's direction; that he transacted business that he was told to, and if there was any doubt about the matter he asked his father about it and did what his father told him to do. Augusta Humpler, the daughter of Mrs. Springer, who lived with her, after Fred Emmel became sick went to the office or to his house at various times to collect money for her mother. On Janu-

ary 22, 1917, the plaintiff in error went to Mrs. Springer's house and obtained from Mrs. Humpler a number of notes, together with the mortgages securing them, amounting all together to over $5000, giving her a typewritten receipt which he had already prepared and signed in his own name, in which it was stated that all back interest was to be collected and the loans replaced or other loans to be furnished by February 25, 1917. This is the transaction upon which the conviction is based. On January 30 plaintiff in error obtained a loan of $3500 on a note signed by himself and his father, as collateral security, for which he delivered to the payee $3525 in amount of the notes and mortgages which he had obtained a few days before from Mrs. Springer. The proceeds of the loan were applied to the payment of a note of the plaintiff in error and his father for $5000, which plaintiff in error testified was his father's debt though the plaintiff in error had received a part of the proceeds of the loan.

It is insisted that the evidence does not sustain the verdict. Augusta Humpler testified that the plaintiff in error, when he came with the receipt on January 22 to get the securities, told her that he wanted to get the mortgages on which the interest was due and which needed renewal and put them in the February term of court to foreclose and promised to return them by February 25. He had the receipt in typewriting already prepared and told her that he wanted those notes,—that his father had sent him for them. Nothing was said in the conversation to persuade her to turn them over but she did just as he asked her to do. He promised to return them and she had no doubt they would be returned. That had been the custom for years,—to get the papers and return them, or others in their place,—and it had been left to Fred Emmel, the father, as to the kind of mortgages he would give. Mrs. Springer was not present. She was in another room and her daughter did not know whether she heard the conversation or not. Nothing

was said to her. Mrs. Humpler got the mortgages and she
and the plaintiff in error sat down and counted the interest
due on the notes and wrote it on the papers. She had a
conversation with him over the telephone after February 25.
He told her the matter had not been settled and it would
take ten or fifteen days longer.

The plaintiff in error testified that after receiving cer-
tain directions from his father he made the typewritten
receipt from a memorandum, except as to the Wall mort-
gage, the reference to which was written in afterward at
Mrs. Springer's house, and went down to Mrs. Springer's
and saw Mrs. Humpler. He told her he wanted the mort-
gages mentioned in the receipt; that he wanted to clean up
matters; that the Crowder loan would very likely have to
be foreclosed and he wanted to settle up the others. He
said that his father told him how he expected to settle up
these loans and that he was going to clean up his business
with the Springers. He told Mrs. Humpler that he wanted
to give the receipt on account of his father's condition and
told her what his instructions were; that his father wanted
to close up those papers, see that the interest was all paid
and return them or some other papers, and the Crowder
loan would probably have to be foreclosed. The plaintiff
in error got the papers and left the receipt. He and Mrs.
Humpler figured when the interest was paid to and what
was due. His purpose was that she should have a detailed
statement on account of his father's condition. He did
not see Mrs. Springer at all, and never, either then or be-
fore, got any papers from Mrs. Springer. When he got
the papers that day he delivered them to his father at his
home the same day. His father gave him further instruc-
tions about those mortgages, and told him that his plans
were that he intended to clean up the Springer business
and that he would make a settlement with her for those
papers. Afterward he received instructions from his father,
who directed him to take certain of those papers and raise

some money to pay off a note. He mentioned the Goldsborough, Hooker and Frailey papers, but did not remember whether the Hopkins paper was taken then or not. When the papers were given to the plaintiff in error he pledged them as collateral security to pay the $3500 note, according to his father's directions. He signed the $5000 note, which was paid off, with his father, and the indebtedness it represented was his father's.

The plaintiff in error's version of the matter is that he was acting not on his own initiative but merely as the representative of his father and under the latter's direction; that he had no wrong intent, but that he supposed his father was about to make a settlement of his affairs with Mrs. Springer and would return the securities to her or substitute others for those used, as had been his custom in the management of her business for many years. It was a question of fact whether the transaction was in good faith what the plaintiff in error represented it to be,—a taking of the securities by the plaintiff in error for his father and under his father's direction for the purpose of collecting the interest and renewing them,—or whether it was a device of the plaintiff in error to get possession of the securities for the purpose of converting them to his own use. If acting honestly under his father's direction he merely procured the securities for his father to enable the latter to make a settlement of his business with Mrs. Springer, there was no criminality in such action. If he falsely represented that this was his purpose, intending at the time to convert the securities and use the proceeds for his own benefit, a different question would be presented.

In this connection it is to be observed that there was no necessity for the plaintiff in error to make any representation in order to obtain the securities. He had only to go or send and ask for them and they would have been turned over to him without hesitation, as had been done before and as had been the custom of Mrs. Springer with

his father for many years. Mrs. Humpler testified, in substance, that the plaintiff in error said nothing to persuade her to turn over the notes but she did just as he asked her to and had no doubt that the papers would be returned as he promised, as had been the custom for many years. It is argued that the evidence shows no trick or device practiced or misrepresentation made to obtain the securities but that they were delivered without question because of the confidence reposed in the plaintiff in error and his father on account of a long succession of fair dealing and honest transactions, and that the obtaining of money or property by reason of a belief in the honesty of the person to whom it is delivered, inspired by previous honest transactions, does not constitute the confidence game.

The confidence game has been defined as any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. If the transaction is, in fact, a swindling operation, it is immaterial that the form assumed is that of a lawful contract or business transaction. (*Maxwell* v. *People*, 158 Ill. 248; *DuBois* v. *People*, 200 id. 157; *Hughes* v. *People*, 223 id. 417; *Chilson* v. *People*, 224 id. 535; *People* v. *Depew*, 237 id. 574.) It is also immaterial how the confidence has been acquired, if it is, in fact, used to enable the person in whom it is reposed to obtain the property of his victim for the purpose of swindling him out of it. Where one has acquired the confidence of another, whether suddenly and by falsehood and deceit or by a long course of honest business dealing, and has made use of that confidence to obtain the other's property with the intention of cheating the latter out of it and for that purpose, the person so obtaining the property may, under our statute as it has been construed in the cases cited and in *People* v. *Crawford*, 278 Ill. 134, be convicted of obtaining the property by means of the confidence game. The facts in this case permit of no question of the confidence reposed or of the fact that by reason of it the plain-

tiff in error obtained the property,—that is, procured the change of possession to himself by his own positive action and not by mere passive acceptance. The point in issue was the intention with which he procured the possession, and that depended, as is usually the case, entirely on circumstantial evidence, except for his own testimony. There was not an entire failure of proof on the part of the prosecution, as the plaintiff in error insists, but we shall express no opinion as to the weight of the evidence, since there must be a new trial because of error in the admission of evidence.

What has been said in regard to the evidence was necessary in the consideration of an instruction which the court gave, which counsel for the plaintiff in error insist was erroneous. That instruction was as follows:

"If the jury believe from the evidence, beyond a reasonable doubt, that on January 27, 1917, Lisetta Springer was the owner of the notes and mortgages in question, and that on or about said date Augusta Humpler was acting as the agent and representative of the said Lisetta Springer, and as such agent and representative had control of said notes and mortgages; and if you further believe from the evidence, beyond a reasonable doubt, that the defendant applied to said Augusta Humpler, knowing her to be such agent and representative, and requested her to deliver said notes and mortgages to him while she was so acting as such agent and representative of said Lisetta Springer; and if you further believe from the evidence, beyond a reasonable doubt, that by reason of long acquaintance, friendship, business relations or other causes with the defendant that the said Lisetta Springer, or the said Augusta Humpler while acting as the agent or representative of the said Lisetta Springer, had confidence in the defendant, and by reason of such confidence so reposed in said defendant did deliver said notes and mortgages to him; and if you further believe from the evidence, beyond a reasonable doubt, that the defendant procured the said notes and mortgages from the

said Lisetta Springer, or the said Augusta Humpler acting
as the agent of the said Lisetta Springer, with the pur-
pose and intent of converting them to his own use; and
if you further believe from the evidence, beyond a reason-
able doubt, that the defendant, after he acquired posses-
sion of said notes and mortgages, did convert them to his
own use, you may take these facts into consideration in de-
termining whether or not the said defendant is guilty of
the crime charged in the indictment or some count thereof."

The objection made to the instruction is that it author-
ized a conviction based upon the creation of a confidence,
not by any representations or actions at the time the prop-
erty was received but arising out of the long acquaintance,
friendship, business relations or other causes between the
plaintiff in error and Mrs. Springer. As has already been
said, it is immaterial by what means the confidence has
been acquired if it is made use of for the purpose of pro-
curing the property and with the intention of cheating the
owner out of it. The instruction requires more than the
mere delivery of the notes and mortgages by Mrs. Humpler
to the plaintiff in error by reason of a confidence inspired
by long acquaintance, friendship, business relations or other
cause. It requires that the plaintiff in error procured them
from Mrs. Humpler having at the time the intent and pur-
pose to convert them to his own use. To procure implies
action on the part of the plaintiff in error to bring about,
by some means or effort on his part, the delivery of the
possession to him. If, knowing the trust reposed in him,
a person accepts securities voluntarily offered to him with-
out action of any kind on his part to induce the offer, to
be collected or sold or to be kept safely, even though he
may have the intention when he receives them to convert
them to his own use, he is not guilty of obtaining them
by means of the confidence game, for he has done nothing
to procure them or with that purpose in view. If, how-
ever, he procures them to be delivered to him by some act

of his own or misrepresentation, whether of a fact or his purpose, and with the intent to convert them to his own use, his conduct comes within the definition which has been given of a confidence game. It was not error to give this instruction.

The plaintiff in error argues that there is a variance because the indictment charges the defendant with obtaining from Lisetta Springer her money and property by means of the confidence game while the proof shows that the property was obtained from Augusta Humpler, the agent of Lisetta Springer; that proof of obtaining the securities from Augusta Humpler does not sustain the charge of obtaining them from Lisetta Springer. It has been held that an indictment for obtaining goods from an agent may allege the agent as the person defrauded, (*Commonwealth* v. *Blanchette,* 157 Mass. 486,) and that where money belonging to three was obtained from the possession of one as the agent of the other two, the indictment may charge it with being obtained from the former. (*Regina* v. *Dent,* 47 E. C. L. 249.) It has also been held that upon an indictment for obtaining property by false pretenses made to a corporation it is not necessary to allege that the representations were made to any person connected with the corporation. (*State* v. *Hulder,* 78 Minn. 524; *State* v. *Turley,* 142 Mo. 403.) It is sufficient to allege that the property obtained was either that of the general owner or the agent in possession of it and to prove that the confidence game was practiced either on the owner or the agent.

Herman Springer, a son of Lisetta Springer, testified that in 1913, while he was working in Fred Emmel's office, the plaintiff in error told him that the plaintiff in error had a chance to lend some money to three men whose note for $2200 he showed the witness, but he could only raise half the money, and if Herman and his mother could raise the other half the plaintiff in error would give them his note for that amount and the note for $2200 as collateral se-

curity; that they gave the money to the plaintiff in error, and he gave Mrs. Springer his note for $1100, dated October 6, 1913, with the $2200 note as collateral. These two notes were also offered in evidence, together with the testimony of the persons whose names appeared on the $2200 note that they had not signed it or authorized the signatures. This evidence was all objected to because it was an entirely independent transaction having no relation to the charge against the plaintiff in error or tendency to prove it; that if it showed the crime of obtaining money by means of the confidence game the prosecution was barred by the Statute of Limitations; that the evidence tended to prove forgery, which was not charged in the indictment, and did not tend to prove an offense similar to that charged in the indictment. The objection to this evidence should have been sustained. Its tendency was to prove an entirely distinct, independent crime having no connection with that for which the plaintiff in error was on trial. It is, of course, a general rule of evidence that proof of a distinct, independent offense, though of the same kind, is not admissible upon the trial of a person charged with crime. While not logically evidence of the crime charged, the effect of proof of the commission of another crime equally wicked cannot fail to be prejudicial to a defendant by leading the jury to suppose him to have an inclination to crime or at least a willingness to commit crime. (*Bishop* v. *People,* 194 Ill. 365; *Janzen* v. *People,* 159 id. 440.) There is an exception to the general rule, which permits proof of acts of the defendant of a similar character to those charged in the indictment, even though such acts amount to a separate, independent crime, where they tend to show motive, knowledge or intent. *Lipsey* v. *People,* 227 Ill. 364; *People* v. *Hagenow,* 236 id. 514; *People* v. *Crawford, supra.*

It is contended on the part of the People that this evidence was admissible for the purpose of showing the busi-

ness relations between the plaintiff in error and the Springers, the method of transaction of business between them, the degree of confidence, friendship and trust reposed, the state of mind of the plaintiff in error and his true intent when he procured the mortgages. The transaction occurred more than three years before the transactions in the present case, while the plaintiff's father was still living and engaged in the active management of his business. It was a loan of money to the plaintiff in error upon his own note, for which he gave a forged note as collateral security. The transaction bore no resemblance to that which is the subject matter of this case. There can be no question of motive or knowledge in this case or of the method of transacting business or the degree of confidence, friendship and trust reposed, upon which this transaction of October 6, 1913, can throw any light. What indication does it give of the state of mind of the plaintiff in error or his intent when he went to Mrs. Springer's house on January 22, 1917, to get her notes and mortgages? None whatever, unless we say that because he deceived her with a forged security three years before, it is probable that he intended to swindle her out of her notes and mortgages by getting them from her and pledging them for his own debt. This we cannot do under the common law system for the conduct of criminal trials, which does not permit proof of the defendant's character or his guilt of other crimes for the purpose of raising the presumption that he would be likely to commit the crime charged.

It was also error to give the following instruction:

"The court instructs the jury that it is not necessary that the People prove that the defendant obtained, by means and by use of the confidence game, all of the property mentioned in the People's bill of particulars or that it was of the precise value as stated in the indictment. It is sufficient if the jury believe from all the evidence, beyond a reasonable doubt, that the defendant obtained any of the

property mentioned in said bill of particulars in manner and form as charged in the indictment, and that said property had some value."

The State's attorney filed a bill of particulars stating the property claimed to have, been secured by the plaintiff in error from Mrs. Springer and made the basis of the indictment. It mentions the sum of $1100 in cash and checks, the amount of the loan which the plaintiff in error secured from Mrs. Springer on the security of the forged note for $2200. This transaction occurred nearly five years before the finding of the indictment, and if the offense of obtaining money by means of the confidence game was committed it was barred by the Statute of Limitations, yet the instruction authorized the jury to find the defendant guilty if he obtained any of the property mentioned in the bill of particulars, which would include this money. It is true that the court, at the request of the defendant, gave another instruction which informed the jury that the defendant was not being tried for obtaining any money or property by means of that $1100 note but that the note was admitted in evidence only for the purpose of showing the business relations between the defendant and Mrs. Springer, and that the only property that the defendant was being tried for obtaining was the notes and mortgages turned over by Augusta Humpler to the defendant. But while the jury were so instructed, at the same time they were instructed that if they found that he had received the money they could find him guilty, and we cannot tell which instruction the jury may have followed. Contradictory instructions ought not to be given, because the jury will be left in doubt, and it cannot be presumed that they will know which instruction should be accepted as the law of the case.

For the errors indicated the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*