HARRELL v. STATE.

Opinion delivered December 7, 1925.

1. LARCENY—SUFFICIENCY OF EVIDENCE.—In a prosecution for grand larceny, evidence *held* sufficient to sustain a conviction.

2. LARCENY—ALLEGATION AND PROOF OF OWNERSHIP.—In a prosecution for grand larceny, where general and special ownership of the property was alleged to be in different persons, proof of the special ownership was sufficient.

3. LARCENY—INDICTMENT—FELONIOUS INTENT.—An indictment for grand larceny, charging that defendant did unlawfully and

feloniously steal, take and carry away, *held* to charge felonious intent.

4. CRIMINAL LAW—HEARSAY EVIDENCE—HARMLESS ERROR.—In a prosecution for grand larceny, statement made by accused's father to third person, in absence of defendant, while hearsay, was harmless where defendant in his testimony made the same statement.

Appeal from Faulkner Circuit Court; *George W. Clark,* Judge; affirmed.

*W. D. Swaim, Lewis Rhoton* and *Geo. F. Hartje,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. Earl Harrell was indicted in one indictment for the offenses of grand larceny and receiving stolen property. The first count charged the offense of grand larceny, and the second count the offense of receiving stolen property knowing the same to have been recently stolen. It was charged in the first count that Earl Harrell in the county of Faulkner, State of Arkansas, on the 15th day of April, A. D. 1925, 150 bushels of cotton seed of the value of $100, 250 bushels of corn, of the value of $400, 180 bales of hay of the value of $75, a total value of $475, the personal property of B. D. Brockington, being then and there in the custody and possession and control of J. I. Summers, the sheriff of Faulkner County, Arkansas, did then and there unlawfully and feloniously steal, take and carry away, against the peace and dignity of the State of Arkansas."

John Mitchell testified that he lived in Faulkner County; that he had in his custody at the request of the sheriff of the county a certain crop consisting of 200 bushels of corn, 3,000 pounds of cotton seed and 180 bales of hay. The corn was worth from $1.35 to $1.50 per bushel. He placed the corn and the cotton seed in a crib, and the hay in a separate barn. He nailed a board across the door of the crib. C. S. Harrell, father of Earl, lived about thirty steps from the crib at the time the crib was destroyed by fire. Earl Harrell lived something like

two miles from his father. Witness lived about 175 yards from C. S. Harrell. On a Sunday night in April, 1925, witness was aroused from sleep by some one screaming down at C. S. Harrell's. He went down there, and found that the barn containing the corn and cotton seed was on fire. The roof had not yet fallen in. In witness' opinion from his observation of the pile of corn when the barn fell in there were not more than 20 or 25 bushels of corn in the barn when it burned. Witness described to the jury the situation of the barn, and stated that he had nailed a plank across the crib door to make the same secure. When witness arrived there, the plank had been removed from the crib door. The fire occurred about twelve o'clock at night. Witness observed the tracks of a wagon in the lot, and traced these from under a wagon shed in front of the crib door and through the lot gate to the field gate. The barn was on the place occupied by C. S. Harrell about which there was a controversy between him and Brockington. In about five minutes after witness arrived Sam Ark came, and witness met Mrs. Harrell running toward the fire with a bucket. No one else was present at the fire but C. S. Harrell, his wife and Sam Ark.

The witness was asked the following: "Q. Did you hear a conversation at the fire between Sam Ark and C. S. Harrell as to the whereabouts of the team? A. Yes, sir. Q. Tell the jury what Mr. Ark said to Mr. Harrell and the response of Mr. Harrell to Ark's question." The appellant objected to the question. The court overruled the objection. The appellant saved his exceptions The witness answered: "A. Yes, sir. Q. You recall the conversation between Mr. Harrell and Mr. Ark? A. Yes, sir, with reference to the whereabouts of the wagon and team. Well, Mr. Ark asked him where his team was, when he got there. Q. What did Mr. Harrell say? A. He said one of his work mules was out in the field, and the other was out in the pasture. Mr. Ark also asked where the wagon was, and Harrell said, 'Well, just

to tell the truth about it, my wagon and team is down at Mr. Dawson's.' "

Mitchell further testified that C. S. Harrell had only one wagon, and it had two inch tires. The corn in the crib was ear corn in the shuck.

Sam Ark testified and corroborated the testimony of Mitchell as to the appearance of the wagon tracks and also as to the conversation between himself and C. S. Harrell.

Neal Webb testified that he was a deputy sheriff of Faulkner County, and was called to C. S. Harrell's residence on the morning of April 13th. When he arrived, he didn't see any tracks in the lot. Something had been dragged over the tracks across the lot before witness got there, and also over the tracks to the pasture gate. At the lot gate witness picked up the track. It was a mule track on the left, and witness didn't notice any other track. The wagon track looked like a tolerably new wheel not quite two inches broad to a new three-quarter wagon. Witness followed the track all the way for two miles through the mud, and they were leading to the house. Witness became confused with a similar track going in the opposite direction. The wagon track had mashed the grass down, and witness could not tell for sure that it was the wagon track he started with, but now and then he would see it plain enough to identify it. Witness followed the track for a mile and three-quarters through the field, and struck the gap or gate where they came out; found the tracks all the way there, and witness discovered that the same track that went out came back. The same outfit went both ways into the field. In tracing the track witness and sheriff Summers picked up the mule track a quarter of a mile from the defendant's home— the same track they had picked up down at the lot gate. The track led to Earl Harrell's house. Where the tracks crossed the branch there were some shucks that had fallen out that were not wet through. When they got to the branch they discovered the tracks and the shucks,

and when they got to the house the wagon had turned into the lot, and had come back. They saw that it was the same wagon, and the same mule track. They also discovered about ten or fifteen bushels of corn in the crib, that looked as if it had just been thrown in. It was near the door of the crib. Witness didn't know whether there was any more corn in there or not. Witness examined the ruins of the fire which was still smoldering. Most everything had burned up. There were fifteen or twenty-five bushels of corn in the pile. Witness, in tracing the wagon tracks, found shucks within a quarter of where the barn burned.

J. I. Summers testified that he was sheriff of Faulkner County, and as such process was placed in his hands for an attachment on the property described in the indictment, which he served and placed the property in the custody of John Mitchell, who was acting as witness' agent. Before the barn was burned on Sunday night, witness was notified that the property had been advertised for sale under an order of the court. Witness corroborated the testimony of Webb as to what he discovered when witness went to the place where the barn burned, and in tracing the wagon tracks. Witness stated that, in tracing the wagon tracks, when they reached the house of defendant, they found some corn in the rear end of his crib. Defendant told witness that he got that corn from Dawson, but later stated that he got it from his brother. The corn in the crib didn't look like Dawson's corn. Witness didn't know the kind of corn that he had attached of the property of Brockington. The ear of corn that witness picked up at C. S. Harrell's where the fire occurred was a nubbin, and the corn in the defendant's crib was very light corn. Witness saw the corn that Dawson had in the crib, and it didn't correspond with the corn witness found in the front part of defendant's crib. It was entirely different corn. The corn that witness attached and placed in Mitchell's possession was attached as the property of Brockington.

Witness also stated that he had a conversation with C. S. Harrell, the father of defendant, when he went down to the place where the barn was burned, and C. S. Harrell told witness that the week before about five or six wagons came in, and hauled away that many loads of corn. Witness didn't give any authority to haul the corn away.

Witness Dawson on behalf of the defendant testified that he knew the defendant. A few days before the fire witness sold defendant eleven bushels of sorry new-ground corn. A wagon going from witness' house to defendant's house would travel over the same road on which the tracks and shucks are alleged to have been found. Witness was plowing with C. S. Harrell's mules on Saturday preceding the Sunday night of the fire. Sunday morning Harrell's wagon was in the corner of the field next to witness' field. Witness didn't know where Harrell's team was Sunday night, but witness plowed with the team on Monday morning. Witness didn't tell Summers that he had not sold corn to any one. Witness told Webb that he had sold corn to Earl Harrell, and Summers was present at the time.

Other witnesses testified on behalf of the appellant, and the appellant himself testified. Their testimony tended to prove that the appellant was not guilty of the crime charged, and of which he was convicted. The jury returned a verdict finding appellant guilty of grand larceny, and fixing his punishment at one year in the State Penitentiary. Judgment of sentence was entered in accordance with the verdict, from which is this appeal.

1. Counsel for appellant contend that there is no evidence to sustain the verdict. It could serve no useful purpose to discuss the testimony. It is set forth above and speaks for itself. Suffice it to say we are convinced, that it was an issue for the jury under the evidence to determine whether or not appellant was guilty of grand larceny as charged in the indictment.

2. The appellant contends that, inasmuch as it was charged in the indictment that the property alleged to

have been stolen was the property of B. D. Brockington, it was necessary to prove that allegation. Such is the general rule. *Fletcher* v. *State,* 97 Ark. 1; *Russell* v. *State,* 97 Ark. 92; *Wells* v. *State,* 102 Ark. 627. But in the case at bar, while it was alleged in the indictment that the personal property was that of B. D. Brockington, there was the further special allegation that the property at the time it was alleged to have been stolen was "in the custody and possession and control of J. I. Summers, the sheriff of Faulkner County, Arkansas." This allegation of special ownership, custody and control made it unnecessary to prove the allegation of general ownership. For it was wholly immaterial who owned the property if, at the time the same was stolen, it was in the possession, and under the control of some other person, and the possession and control of such person was alleged and proved. Such proof of special ownership and of the felonious taking, stealing and carrying away from the custody of such special owner would constitute larceny.

It is impossible for the appellant to have been misled by the allegation in the indictment as to the ownership, and the proof adduced by the State to establish such ownership. While general and special ownership was alleged, proof was made of special ownership, and of the control and possession of the property at the time the same is alleged to have been stolen. This meets every requirement of the law. In *Porter* v. *State,* 123 Ark. 519-522, we announced the principle which controls here as follows: "In other words, an indictment must allege the names of the owners to enable the court to pronounce judgment, on conviction, according to the rights of the case, and to prevent prejudice to the substantial rights of the defendant. If he is to be convicted, he has the right to have named in his indictment all persons who are supposed to have been aggrieved by his act, so that he may prepare for his defense, and plead the acquittal or conviction successfully, should he be again indicted for

the same offense, but when this has been done, and the indictment is otherwise sufficient, he is not prejudiced by the insertion of the name of a person as an owner who, in fact, has no interest in the property alleged to have been stolen." Here it was alleged that the property was that of B. D. Brockington, and that the special custody and control was in Summers, the sheriff. There was proof tending to show that Brockington had the process of attachment issued under which the sheriff obtained special possession and control of the property. The testimony was sufficient to meet the requirements of the law as to the proofs of ownership.

3. The appellant next contends that the testimony upon which he was convicted was wholly circumstantial, and not sufficient to sustain the verdict. Even though the testimony was circumstantial, as already stated, it was sufficient to sustain the verdict.

4. Appellant's contention that the indictment wholly fails to allege a felonious intent is not well taken, for the indictment expressly charges that the defendant "did then and there unlawfully and feloniously steal, take and carry away, etc." Thus felonious intent is expressly alleged. *Parker* v. *State*, 130 Ark. 234.

5. The last contention of appellant is that the court erred in permitting the statements by the father of the defendant to Sam Ark and John Mitchell, in the absence of the defendant, to go before the jury. These witnesses, as set forth above, testified that when they questioned the father of the defendant on the night of the fire as to the whereabouts of his wagon and team he replied, "To tell the truth, they are down at Dawson's." This testimony was purely heresay and highly prejudicial to the appellant, and the court erred in admitting the same, which error, unless obviated or cured, would entitle the appellant to a reversal of the judgment. *Moore* v. *State*, 151 Ark. 515. But we find that the appellant, in his cross-examination, was asked the following question: "Where were your father's wagon and team when you were at his

house that evening," and he answered, "He said his wagon was over next to Mr. Dawson's field." This answer of appellant in response to the question propounded was wholly voluntary on his part. It was substantially the same as the testimony of Sam Ark and John Mitchell as to what C. S. Harrell had said when asked concerning the whereabouts of his wagon and team on the night of the fire. Since the appellant himself volunteered the same information contained in the testimony objected to, he is certainly not prejudiced by such testimony.

In *Clayton* v. *State*, 159 Ark. 592, speaking of testimony to which objection was made, we said: "Still no prejudice resulted to the appellant from such testimony, because appellant himself took the witness stand, and testified to the same state of facts brought out by such testimony."

. The record presents no reversible error, and the judgment is therefore affirmed.