John Wesley HOOVER, Jr. *v.* STATE of Arkansas

CR 77-187                                562 S.W. 2d 55

Opinion delivered February 27, 1978
(Division II)

*Jack L. Lessenberry,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Joseph H. Purvis,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. John Wesley Hoover, Jr. was found guilty of obtaining personal property of the value of more than $35 under Ark. Stat. Ann. § 41-1901 (Repl. 1964). He seeks reversal of the judgment, contending that the information should have been dismissed, that the evidence was insufficient to support the verdict and that there was prejudicial error in statements made by the prosecuting attorney in closing argument. We find no error and affirm.

Appellant contends that the information charging him should have been dismissed at the conclusion of the state's evidence. But the grounds for dismissal argued here were not then urged in the trial court and cannot properly be raised for the first time on appeal. *French* v. *State,* 260 Ark. 473, 541 S.W. 2d 680; *Dyas* v. *State,* 260 Ark. 303, 539 S.W. 2d 251. Furthermore, appellant has not made a convincing argument or furnished any authority for his present contention that the information should have been dismissed because it should have been laid under Ark. Stat. Ann. § 41-1906 (Repl. 1964), which deals with false written statements to be used as a basis for credit, instead of § 41-1901. This argument is based upon the premises that strict construction given penal statutes requires application of § 41-1906 and that an act containing special provisions must be read as an exception to a general rule in an earlier act. Under the *Dixon* rule, this court is not required to treat such points. *Dixon* v. *State,* 260 Ark. 857, 545 S.W. 2d 606.

Appellant argues that even though it might appear that he was properly charged under § 41-1901, that the evidence on behalf of the state falls clearly within the provisions of § 41-1906, and that the latter specifically governs the conduct shown by that evidence. When we view the evidence in the light most favorable to the state, as we must, it also clearly falls within the provisions of § 41-1901. No instruction was requested which would have permitted the jury to find appellant guilty of the misdemeanor defined in Ark. Stat. Ann. § 41-1906 instead of the felony of which he was found guilty.

On superficial examination, it appears that the misdemeanor might be a lesser included offense of that charged by the information. We need not decide that question, however. As we will presently point out, the state's evidence, viewed in the light most favorable to it, clearly tended to show that appellant was guilty of the greater offense, and the verdict was supported by substantial evidence. If § 41-1906 did constitute a lesser included offense, appellant cannot now complain that the jury did not consider that statute, because he failed to ask for an instruction that would have permitted it to do so. *Perry* v. *State,* 254 Ark. 939, 497 S.W. 2d 10; *Stevens* v. *State,* 231 Ark. 734, 332 S.W. 2d 482.

Appellant's argument that the evidence was insufficient to sustain his conviction is based upon: (1) the information alleged that the money in question was obtained from Dale Hinckle, but his mother was the owner of it, either in her own right or jointly with his aunt, and (2) the money was originally placed in an escrow account of Southwest Realty Company and was not loaned to Hoover until a later date; (3) since Dale Hinckle was not the real owner of the property and the real owner did not testify, appellant was denied his constitutional right to be confronted by his accusers.

Appellant relies upon *Von Tonglin* v. *State,* 200 Ark. 1142, 143 S.W. 2d 185 and *Andrews* v. *State,* 100 Ark. 184, 139 S.W. 1134. Those cases are distinguishable, but not because both involve larceny instead of false pretenses. In *Von Tonglin,* the fatal variance was that the evidence showed that the cow stolen belonged to Mrs. F. M. Randolph, the mother of Joe Randolph, who was named as its owner in the indictment. It

was specifically pointed out in that case, however, that there was no evidence that the son had the exclusive possession, or right to possession of the cow. In *Andrews,* the variance was not fatal. The ownership was alleged to be in a partnership. The partners were named, as was the partnership. It was held that variance in the name of one of the partners was immaterial because the property was sufficiently identified by reason of the fact that the partnership was correctly named. It was clearly indicated in *Andrews* that correctly naming the injured party is essential to the identification of stolen property in indictments for larceny and kindred offenses. Looking to other cases, we find that in a larceny case, allegation of ownership in one having exclusive possession and control of the property stolen is permissible and that proof that actual ownership or title is in another is not a fatal variance. *Cook* v. *State,* 80 Ark. 495, 97 S.W. 683; *Monk* v. *State,* 105 Ark. 12, 150 S.W. 133; *Houpt* v. *State,* 157 Ark. 171, 247 S.W. 770. Subsequent to our decision in *Van Tonglin,* we held that it is not error to allege ownership in one who was in possession and control of the property. *Tate* v. *State,* 204 Ark. 470, 163 S.W. 2d 150.

We have also held that the allegation of general ownership in a named person is sufficient to allow proof of special ownership, such as that of a bailee, in that person. *Brown* v. *State,* 108 Ark. 336, 157 S.W. 934. In *Monk* v. *State,* supra, there was not a fatal variance, even though a watch and fob stolen belonged to a wife by virtue of a gift from her husband, who was named as the owner in an indictment for larceny, when the evidence showed that the wife had given them to him for safekeeping and that he had not returned them to her at the time they were taken from under the pillow of the bed occupied by both. It has also been held in a larceny case that it was fairly inferable that a landlord had possession and special ownership of seed cotton grown on his farm by a tenant, when the evidence showed that the landlord had a lien on the cotton to secure the payment of rent amounting to one-fourth of the cotton and that, by agreement with the tenant, the landlord would sell the cotton and apply the excess over the rent to the tenant's account with him. *Holden* v. *State,* 168 Ark. 465, 270 S.W. 596. It is wholly immaterial who owns the stolen property, if, at the time it is stolen, it is in the possession and under the control of another person alleged in

an indictment to be the owner, and possession and control in such a case constitutes special ownership. *Harrell* v. *State,* 169 Ark. 1038, 278 S.W. 45.

Robbery has been considered a kindred offense, in that the requirements as to allegations of ownership are precisely the same as in larceny. *Boles* v. *State,* 58 Ark. 35, 22 S.W. 887. We have held that there was not a fatal variance between allegation of ownership in a bank cashier of money stolen in a robbery of a bank and evidence showing that the cashier was the officer of the bank in charge of the money and that it was taken from the bank and out of his custody by putting him in fear. *Jenkins* v. *State,* 131 Ark. 312, 198 S.W. 877. In *Powell* v. *State,* 251 Ark. 46, 471 S.W. 2d 335, cert. den. 406 U.S. 917, 92 S. Ct. 1763, 32 L. Ed. 2d 115, a robbery case, we said that ownership may be laid in an indictment, either in the real owner or the person in whose possession the property was at the time of the theft.

We have also held that an allegation that money was obtained by false pretenses from a named person is a sufficient allegation of ownership in that person and a sufficient identification of the money taken to withstand a demurrer. *Silvie* v. *State,* 117 Ark. 108, 173 S.W. 857.

We take the crime charged here to be sufficiently analogous to larceny that allegations of ownership in one from whom the money was obtained by the false pretense is sufficient and proof that it was actually owned by someone else is not a fatal variance. See *Flannigan* v. *State,* 232 Md. 13, 191 A. 2d 591 (1963); *State* v. *Cobb,* 122 W. Va. 97, 7 S.E. 2d 443 (1940). We have held that, in false pretense, it is not necessary that the indictment charge that the person from whom the money or other thing of value is obtained suffered any loss or damage, and that the crime is complete when the property is obtained. *Fisher* v. *State,* 161 Ark. 586, 256 S.W. 858. This is the same reasoning we have applied in the case of robbery and analogous to that to which we have resorted in larceny cases where there is a special ownership.

Even in jurisdictions where an allegation of ownership is mandatory, it has been held that proof of actual or constructive possession by, or of any legal interest or special property

in the person alleged in the indictment to be the owner is sufficient. See *Flannigan* v. *State,* supra; *State* v. *Cobb,* supra. See also, *Barnett* v. *State,* 152 Tex. Cr. 626, 216 S.W. 2d 218 (1948). Alleging ownership in an agent of the owner is sufficient if the agent is in possession of the property. *People* v. *Emmel,* 292 Ill. 477, 127 N.E. 53 (1920).

Appellant contends that Dale Hinckle never had actual physical possession of the funds involved and that they were, when he obtained them, in an escrow account of Southwest Realty Company, a corporation. We find that there was substantial evidence to show that, when the alleged false representations were made by Hoover, Dale Hinckle was an agent of his mother and aunt having constructive possession or such control of the money to support an allegation of ownership by him.

Hoover was an officer and director of Southwest Realty Company. Lee DeBoard was also an officer and director of this corporation. Dale Hinckle was in the insurance business. Hoover and DeBoard wanted an insurance agency in connection with their real estate company and met with Hinckle to promote a consolidation of their businesses. As a result, the three formed an insurance agency known as Financial Insurance Services, Inc. They were to be equal stockholders, but when Hoover failed to pay for his stock, it was revoked. Hinckle testified that Hoover approached him about November 1 for a loan of $16,000. He said Hoover agreed to personally guarantee repayment and showed him a personal financial statement (which was proven false) in attempting to illustrate how the loan would be repaid. Hoover also promised a mortgage on property in Heber Springs to secure the loan. Hinckle said that he caused the loan to be made. His mother gave him a cashier's check and he turned it over to Southwest Realty and the proceeds were placed in its escrow account. This money was shortly thereafter loaned to Hoover, according to Hinckle. Hoover gave his personal note dated November 11, 1975 for the money payable to Hinckle's mother and secured it by a mortgage in favor of Hinckle's mother. Hinckle testified that, when the money was placed in the escrow account, he was not an officer or director of Southwest Realty, but was "an authorized signatory on any account of Southwest Realty." He also testified that he

retained control of the money through an agreement between him and the officers of Southwest Realty that he was to be conferred with as to how it was spent. Although it was understood that the money would be used in the acquisition of property for a prospective corporation to be called Cedar Point Enterprises, Inc., which would develop the property, Hinckle testified that he made the loan on the strength of Hoover's financial statement, Hoover's promise to give his own note secured by a mortgage and assurance that he had a commitment from the president of the Arkansas National Bank for a loan on the property to be acquired. (This commitment was denied by the bank president.) Hinckle said that he was willing to invest his mother's money, because Hoover guaranteed her 10% interest.

DeBoard testified that Mrs. Hinckle loaned the money about October 7, 1975, and that it was placed in an escrow account to be used on a project which did not go through and that the money was to be returned to her. He said that the deposit in escrow was "from Hinckle through his mother."

Hoover, who was a licensed real estate salesman, made an offer to purchase the Cleburne County property prior to November 11, 1975, the date fixed for closing the purchase. The offer, or option, was in favor of Hoover and he assumed all obligations on it but he testified that he obtained it in behalf of Southwest Realty and others involved. He said that DeBoard and Southwest Realty would have each owned a 10% interest in the project, that Hinckle would have owned 1%, and that the placing of a great deal of the insurance business generated by the ownership and development of the property with Financial Insurances Services would have been assured. He stated that Southwest Realty was not buying the property, but that he was to assign his interest to the new corporation. A fair inference to be drawn from his testimony is that the money placed in the escrow account at Southwest Realty was to be used to buy the land in question; however, Hoover said that DeBoard conducted all the negotiations to obtain the loan and that he gave his personal promissory note to Mrs. Hinckle only because he thought it was the fairest thing to do and that he gave her a mortgage on the property in question to further secure her interests. Hoover attributed the failure of the projected purchase and development to the

financial insecurity of Southwest Realty. Hoover denied ever receiving the $16,000. He said that this money, together with $5,000 he furnished, went into a down payment placed in escrow by check of Southwest Realty. Hoover said that he did not apply this money to the purchase, but that DeBoard did and that the money never came to him.

Not only did this testimony afford substantial evidence that Dale Hinckle had sufficient constructive possession and control of the money of his mother, as her agent, to support the allegation of ownership in him, it was also sufficient to show that the money was obtained from Hinckle by Hoover. Hoover contends that the funds went to Southwest Realty, not to him. The testimony clearly furnishes a substantial basis for a finding that the money, wherever it was placed, was obtained for Hoover's benefit to carry out a contract made by him and on which he personally assumed all obligations. The giving of the note and mortgage by Hoover lends support to such a finding. The fact that Hoover did not actually obtain or receive the money personally, however, does not constitute a fatal variance if it was delivered to another at his request or instance or in accordance with his wishes. *Fisher* v. *State,* 161 Ark. 586, 256 S.W. 858.

Appellant supports his contention that the information should have been dismissed with an argument that there are conflicts between the testimony of DeBoard and that of Hinckle. It would not be inappropriate to infer from DeBoard's testimony that he had sympathy for Hoover. The resolution of these testimonial conflicts was for the jury, and its verdict is conclusive on this score. *Barnes* v. *State,* 258 Ark. 565, 528 S.W. 2d 370.

Appellant's novel argument that the failure to allege ownership in Mrs. Hinckle and her sister deprived him of his constitutional right of confrontation by his accusers, particularly in view of the fact that neither appeared or testified during the trial, must also fail. Of course, neither accused Hoover and, on the record before us, it seems highly unlikely that either would have any knowledge of any pertinent fact. At the outset, we should state that *Kerr* v. *State,* 256 Ark. 738, 512 S.W. 2d 13, cert. den. 419 U.S. 1110, 95 S. Ct. 783, 42 L. Ed. 2d 806; *Grooms* v. *State,* 251 Ark. 374, 472 S.W. 2d 724,

the only authorities cited by appellant, are totally inapposite. They relate only to the right of an accused to cross-examine one who does give evidence against him. Amendment Six to the United States Constitution and Art. 2 § 10 of the Arkansas Constitution only assure an accused that he shall enjoy the right to be confronted with the *witnesses* against him. In *Smith v. State,* 200 Ark. 1152, 143 S.W. 2d 190, we stated that the object of these provisions was to protect the accused against adverse testimony from whatever source it might come. We approved and adopted a quotation from Ruling Case Law (8 RCL 84 et seq) in which confrontation was defined as the act of sitting a witness face to face with the accused, in order that, in the presence of the court having jurisdiction to permit the privilege of cross-examination, he may make any objection he has to the witness, and that the witness may identify the accused. It was also pointed out there that these provisions have two purposes, one main and essential, the other secondary. The main and essential purpose is the right of cross-examination. The secondary purpose is to have the personal appearance of the witness, in order first, to enable the judge and jury to observe his deportment while testifying and second, to have the advantage of the subjective moral effect on the witness produced by his presence before the tribunal before which the accused is on trial. In view of the object and purposes of these constitutional provisions, we must say that they assure an accused of confrontation by witnesses against him, but do not require the appearance of the true owner of property alleged to have been stolen or illegally taken or obtained by him, whether he is named in the indictment or information or not.

These constitutional provisions are but a declaration of the common law rule and the constitutional guaranty is confined to those who are witnesses against the accused. *State v. Lonergan,* 201 Or. 163, 269 P. 2d 491 (1954). They do not require that every witness who has knowledge of relevant facts testify. *People v. Mason,* 183 Cal. App. 2d 168, 6 Cal. Rptr. 649 (1960). They do not guarantee the accused that a victim, accuser, complainant, complaining witness, or private prosecutor will be called as a witness or appear at the trial, and the establishment of the elements of the crime by the testimony of other witnesses does not constitute a variance from an indictment naming the victim. *People v. Jolliff,* 31 Ill.

2d 462, 202 N.E. 2d 506 (1964); *State* v. *Malloch,* 225 A. 2d 760 (Me., 1967); *Gaertner* v. *State,* 35 Wis. 2d 159, 150 N.W. 2d 370 (1967); *State* v. *James,* 76 N.M. 376, 415 P. 2d 350 (1966); *Harris* v. *People,* 174 Colo. 483, 484 P. 2d 1223 (1971); *People* v. *Gomez,* 26 Cal. App. 3d 225, 103 Cal. Rptr. 80 (1972); *Commonwealth* v. *Fisher,* 131 Pa. Super. 117, 198 A. 925 (1938). Accord, *Hickinbotham* v. *Williams,* 228 Ark. 46, 305 S.W. 2d 841. Certainly, there is no constitutional requirement that one, who has no personal knowledge of relevant facts and cannot give material evidence concerning the crime, be offered as a witness or appear at the trial. *State* v. *Malloch,* supra; *People* v. *Mason,* supra.

A witness in the sense of these constitutional guaranties is one from whom testimony is adduced and whose testimony or statements on relevant facts are in some way brought to the attention of the court and jury or trier of fact and until there is such testimony or evidence, the right to confrontation does not arise. *People* v. *Kendricks,* 190 Misc. 1058, 75 NYS 2d 216 (1947), aff'd. 79 NYS 2d 895, 273 AD 998, aff'd. 300 NY 544, 89 N.E. 2d 257; *Gaertner* v. *State,* supra; *State* v. *James,* supra. These constitutional provisions do not apply when no testimony, prior statement or utterance of the victim is brought to the attention of the trier of fact, or is offered by the state, or when the accused has been given the right to cross-examine every person whose tesimony or statements have been used to prove the elements of the crime with which he is charged. *State* v. *James,* supra; *Harris* v. *People,* supra. Neither the failure to name the true general owner of the money involved here in the information, nor the absence of the owner from the trial was a denial of appellant's constitutional right of confrontation of the witnesses or a variance from the allegations of the information and he was not entitled to a dismissal of the information or a directed verdict on this ground.

Appellant also contends that the judgment should be reversed because of prejudicial remarks of the prosecuting attorney in closing argument. We note that appellant's objection was sustained on the first statement of which complaint is made and the attorney was admonished to stay within the record. No further action by the court was requested. We certainly cannot say that there was any reversible error on this count, particularly when the propriety of the remark, as an

inference drawn from appellant's own testimony which would bear upon his credibility, is at least arguable. The second statement was not wholly without foundation in the record and the objection made seems to have extended the prosecuting attorney's remark beyond its actual content. The trial court, in response to the suggestion that the prosecuting attorney had gone outside the record, stated that the jury would remember the testimony. The jury was admonished to disregard the third and last comment to which objection was made. There was no motion for a mistrial. The trial judge, in instructing the jury, appropriately stated that closing arguments of the attorneys were not evidence and were made only to help it in understanding the evidence and applicable law and that any arguments, statements or remarks of attorneys having no basis in the evidence should be disregarded.

We will not reverse a judgment on the exercise of the trial court's wide latitude of discretion in controlling, supervising and determining the propriety of the arguments of counsel in the absence of manifest gross abuse. *Perry* v. *State*, 255 Ark. 378, 500 S.W. 2d 387. We find no abuse here.

The judgment is affirmed.

We agree. HARRIS, C.J., and BYRD and HOLT, JJ.