**UNITED STATES of America,
Plaintiff,**

v.

**Robert JOSLYN, Defendant.
CR–72–583–PHX.**

United States District Court,
D. Arizona.

Jan. 23, 1974.

William C. Smitherman, U. S. Atty., D. Ariz., Phoenix, Ariz., for plaintiff; Michael B. Scott, Asst. U. S. Atty., of counsel.

Leslie L. Miller, Phoenix, Ariz., for defendant.

## OPINION

COOPER, District Judge, sitting by designation.

Defendant, convicted by a jury on one count of possession of narcotics with intent to distribute, moves for a new trial on the asserted grounds that: (1) testimony of witnesses John C. Land (hereafter "Land") and Richard Stallworth (hereafter "Stallworth") regarding a statement made by defendant while in

custody was improperly admitted into evidence; (2) defendant was substantially prejudiced by the alleged failure of the Government to give him notice of his statements to Land as required by Fed.R.Crim.P. 16 and Local Rule 86. After careful scrutiny of the papers submitted by both sides, we are firmly convinced that the motion must be denied.

The gist of the instant motion is defendant's contention that the Court erred in admitting into evidence an inculpatory statement made by defendant to Land at the time of his arrest; that the Court should have granted a mistrial when that statement (set forth below) was testified to in the presence of the jury. The unique circumstances under which the statement was elicited at trial make imperative a brief recital of the events which led thereto.

Defendant was arrested October 5, 1972 while driving a car (registered to his parents) in which there were four suitcases containing 56 kilo bricks of marijuana. Defendant was given the warnings due him pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After defendant indicated that he understood his rights and while enroute to official headquarters, Stallworth asked defendant, "How many bricks do you have?" Defendant responded, "I don't know, around 40 or 50." (Tr. Vol. III, p. 172); Government Affidavit of October 24, 1973. Thereafter, Land asked where he was taking the marijuana, to which defendant responded that he wanted to consult an attorney before making any further statements. All interrogation was terminated at that point. (Tr. Vol. II, pp. 191–92).

Defendant and the agents reached their destination, the office of the Yuma City County Narcotic Task Force, some 30 to 45 minutes after defendant's arrest. Shortly thereafter a conversation ensued between Land and defendant, the essence of which Land gave as Hearing testimony:

Q. After transporting him to this location did you engage in conversation with the defendant again?

A. Yes, sir, I did.

Q. About how much time elapsed—time elapse are—are we talking about from the time you picked him up and transported him to the office?

A. Probably 30 to 45 minutes, I—I was conversing with him and had him in the car.

Q. Basically, what were you conversing about?

THE WITNESS: About different things, I—

MR. MILLER: I would object, I would object to the form of the question, it's not basically, we could ask for the conversation.

THE COURT: Yes, just in essence, what did it deal with?

THE WITNESS: If I to the best of my recollection I advised Mr. Joslyn that to further implement my employment I was interested in obtaining the names of the persons to where the marijuana was going to be transported and I advised that if he would cooperate with the government and transport the marijuana on further that I would make this known to the United States Attorney, and to the Judge, who would be handling the case and probably we could make a recommendation. He later then told me that he was to have taken the marijuana to Las Vegas, park it on a parking lot of a laundromat, make a telephone call, and then walk away to return a couple of hours later and pick up his car. Then I told him I said, "Well, let's go to Las Vegas." And he said, "No, I want to consult my lawyer."

BY MR. SCOTT:

Q. All right. And where did this conversation take place?

A. That was at the Yuma City County Narcotic Task Force.

Q. Now, had you made any threats, promises, gestures toward the defendant?

A. No, sir, just what I told you that I would notify the U.S. Attorney of what was said.

Tr. Vol. II, pp. 193–194. Hereafter we refer to this episode as the "Las Vegas statement."

The Government determined that because of the extraordinary circumstances under which the Las Vegas statement by defendant was elicited, it would not seek to introduce it in evidence. This decision was reached without consultation with the Court and no reference was made to the Las Vegas statement in any papers submitted to the Court by either party. In short, the Court had not the slightest intimation of the statement until the moment it was testified to in the presence of the jury. At trial, during lengthy and meticulous cross-examination of Stallworth regarding defendant's custodial interrogation, the Court inquired whether anything further was said by defendant on that occasion. No objection was raised by counsel, whereupon Stallworth testified as follows in respect of the Las Vegas statement (Tr. Vol. II, pp. 172–73):

Q. Now, in reference to Officer Land's advising Mr. Joslyn of his rights, what was the very next thing that took place after you viewed the marijuana, what did Officer Land's say in your presence?

A. Well—

THE COURT: In other words, was there anything that took place, anything that was said by you by Land by this defendant or anyone else on that occasion?

THE WITNESS: Nothing other than advising him of his rights, after that conversation was—

THE COURT: Yes, I asked you was there anything else said?

THE WITNESS: Yes, sir. I asked the defendant how many bricks of marijuana he had and he said somewhere around—I think—he said, "I don't know, around 40 or 50." Then after that there was further conversation between him and Agent Land's.

THE COURT: In your presence?
THE WITNESS: Yes, sir.

THE COURT: On that same occasion?

THE WITNESS: Yes, sir.

THE COURT: Will you please let us have that?

THE WITNESS: Agent Land I believe asked the defendant where he was taking the marijuana; and whether or not he would be willing to convoy or something to that extent as to wherever he was going. He said that he was going to Las Vegas, Nevada, and that he was to park the car in a parking lot where somebody was to pick up the marijuana. And that's all that I really remember.

MR. MILLER: May we approach the bench, Your Honor, if I may?

THE COURT: Certainly.

Defendant then moved for a mistrial on the grounds aforementioned.

An evidentiary hearing was thereafter held to determine the merits of defendant's motion as well as the admissibility of the Las Vegas statement. The circumstances of defendant's custodial interrogation set forth above were there revealed in full. In addition, Land testified that he informed defendant's counsel of the Las Vegas statement prior to commencement of the trial[1] and that counsel responded he would make no use

---

1. THE COURT: All right. Then we'll come to that in a little while. What else did you say if anything to regard—in regard to Mr. Miller and Mr. Fineberg on that occasion?

THE WITNESS: I advised that Mr. Joslyn had told me that he was to have taken the car to Las Vegas, park it, make a tele-

phone call and I believe I said I understand, I realize we are not going to use this unless you answer [sic] the question, and I recall telling Mr. Miller the answer to the question.

(Tr. Vol. II, p. 198)

thereof at trial. This was subsequently confirmed by the Assistant United States Attorney representing the Government at trial who stated to the Court that immediately after the aforementioned conference between Land and defendant's counsel, Land reported it, including the discussion of the Las Vegas statement, to Assistant United States Attorney Wright who in turn verified the same to the Government's trial attorney. Mr. Miller testified that while such a conference did transpire, he had no recollection of being informed of the Las Vegas statement.[2] The Court thereupon denied defendant's motion for a mistrial and ruled the Las Vegas statement admissible.

■ The record is clear that the Government satisfied its substantive obligations under Fed.R.Crim.P. 16 and Local Rule 86 by informing defendant of any recorded statements made by him within its possession. While we do not suggest that defense counsel was anything ·less than completely honest in his failure to recall his pre-trial conversation with Land, the testimony adduced at the evidentiary hearing well satisfies us that the Government did in fact put defense counsel on notice of the Las Vegas statement. We note for future guidance that the Government should have given defendant written confirmation of Land's statement regardless of its intended use by either party. Its failure to do so,

however, certainly was not a violation of the Government's substantive obligation.

■■ Even were we to assume arguendo that defendant was not put on notice with respect to the Las Vegas statement, defendant can claim no prejudice resulting therefrom. The trial court may in its discretion excuse compliance with both Fed.R.Crim.P. 16 as well as Local Rule 86. See United States v. Allsenberrie, 424 F.2d 1209 (7th Cir. 1970); United States v. Barnes, 431 F.2d 878 (9th Cir. 1970) cert. denied, 400 U.S. 1024, 91 S.Ct. 582, 27 L.Ed.2d 637 (1971). The Las Vegas statement was clearly an incriminating one and knowledge thereof would not have facilitated preparation in any way of the defense. Accordingly, the test of whether defendant would be entitled to a new trial—whether there is a significant chance that the new evidence developed by counsel could induce reasonable doubt in the minds of enough jurors to avoid conviction—has not been met. See United States v. Miller, 411 F.2d 825 (2d Cir. 1969); United States v. Heath, 260 F.2d 623 (9th Cir. 1958).

■ Defendant's second contention, that admission of the Las Vegas statement violated his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is equally devoid of merit. The purpose of the *Miranda* warnings is to protect a suspect in custody from coercion effect-

---

2. A. I can honestly say that Officer Land could have or could not have made the statement that there was something that could have been suppressed—that he was informed not to use as he said a statement. I don't recall that, but I'm—I can't say in the same equivocal terms that I don't know all the words about Las Vegas. He might have as well as might not have. I can't honestly remember that one way or the other. (Tr. Vol. II, p. 214)

Thereafter, however, in the presence of the jury, the attorney affirmatively denied that Land had informed him of the Las Vegas statement (Tr. Vol. III, pp. 258–59):

MR. MILLER: I spoke with Mr. Fineberg present, there were just the three of us present at that time. We did discuss the case, also at the time there were no notes taken by Mr. Land as to our discussion. Mr. Land did not tell me at that time of the statement about Las Vegas. He—I did not make any statement about using it or not using it as he claims. He did say something during our hearing yesterday which I could not honestly recall, and I state this to you.

He did state during the hearing that there were certain statements that were not admissible, and therefore wouldn't be used at trial. I don't recall whether he made or did not make that statement to me, but I do recall that I did not hear anything specifically on a statement concerning Las Vegas and specifically making a comment about it as he referred to. I don't remember the exact words, I would not elicit that type of question from him.

ed by police to compel incriminating admissions or confessions. Admissibility is therefore limited to statements of a defendant which are the product of free and rational choice. Exclusion is required only where incriminating statements are made in a context in which free choice is likely to be overcome by the spectre of authority or the tactics of interrogating agents. At no time has it even been suggested here that Land by voice, gesture or movement of any kind conveyed fear to defendant or enticed him into speaking; we are satisfied it was in normal conversational tone. United States v. Viviano, 437 F.2d 295 (2d Cir.) cert. denied, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971). See also United States v. DiLorenzo, 429 F. 2d 216 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971); United States v. Squeri, 398 F.2d 785 (2d Cir. 1968). Whether *Miranda* rights have been violated and in particular whether there has been a waiver of these rights must be determined from the totality of circumstance on a case-by-case basis. United States v. Hilliker, 436 F.2d 101 (9th Cir. 1970), cert. denied, 401 U.S. 958, 91 S.Ct. 987, 28 L.Ed.2d 242 (1971).

The facts adduced at the evidentiary hearing make clear that the conduct and statements of Land with respect to defendant did not create an atmosphere of coercion or improper influence or was in any way violative of that free choice to which defendant was clearly entitled. Defendant was given his *Miranda* warnings shortly after arrest. When thereafter and during interrogation defendant indicated he wished to consult with an attorney, the interrogation ceased. The conversation which followed (the Las Vegas statement) was not at all coercive; we are convinced it did not amount to a continuation of the earlier interrogation. In this respect, the cases cited by defendant are distinguishable. See *e.g.*, Combs v. Wingo, 465 F.2d 96 (6th Cir. 1972); United States v. Priest, 409 F.2d 491 (5th Cir. 1969).

■ Defendant contends, however, that the implied promise of leniency coupled with the promise that any statements thereafter made would not be used usurped defendant's *Miranda* rights and rendered his subsequent statement involuntary. Under the totality of circumstances of that confrontation, we disagree. With respect to the implied promise of leniency, the Ninth Circuit has held that an interrogating officer's representation to a defendant that he would inform the prosecuting authorities if defendant cooperated does not necessarily render defendant's subsequent statements involuntary. United States v. Glasgow, 451 F.2d 557 (9th Cir. 1971). See also United States v. Moreno-Lopez, 466 F.2d 1205 (9th Cir. 1972); Santoro v. United States, 388 F. 2d 113 (9th Cir.) vacated on other grounds, 392 U.S. 301, 88 S.Ct. 2054, 20 L.Ed.2d 1106 (1967). With respect to the promise that statements made by defendant would not be used (Land should not have made such a promise and indeed lacked the authority to do so), it did not create an atmosphere of coercion or improper influence. As we stated at the conclusion of the evidentiary hearing (Tr. Vol. II pp. 233–34):

> The defendant could have rejected the attitude expressed by Mr. Land. There was nothing to compel him to respond. I go further and say that it seems to me that his response was consistent with the notion that he might obtain a benefit if he did cooperate, and it included a recommendation by Mr. Land to the government's prosecuting office, which in turn as is in [sic] the custom would have found its way before the Court at the appropriate juncture of the proceedings.

We find that this defendant was sufficiently intelligent to understand from the *Miranda* warnings, clearly delineated prior thereto, that he had the unqualified right to remain silent. Neither the suggestion of cooperation nor the promise was sufficient under the circumstances to render the Las Vegas state-

ment involuntary. See United States v. Moreno-Lopez, *supra*; United States v. Cook, 432 F.2d 1093 (7th Cir.), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L. Ed.2d 535 (1971); United States v. Williams, 384 F.2d 488 (2d Cir.) cert. denied, 385 U.S. 836, 87 S.Ct. 84, 17 L.Ed. 2d 71 (1966); United States v. Duke, 409 F.2d 669 (4th Cir.) cert. denied, 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970); Santoro v. United States, *supra*.

The unique circumstances whereby the Las Vegas statement was elicited at trial, and its subsequent use thereafter, lend further support to our conclusion that defendant is not entitled to a new trial. The Government did not seek to introduce the statement. Even after the statement surfaced, the Government made no affirmative use thereof until defendant testified that he never made the Las Vegas statement. He even denied making the statement that he had about 40 or 50 bricks of marijuana in the car he was driving. Thereupon the Government used the Las Vegas statement in rebuttal for impeachment purposes only. Such use would clearly be proper under Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970). While this of itself would not justify the prior admission of the Las Vegas statement, it lends further weight to our conclusion that under the totality of circumstances present at the time the testimony was rendered, defendant is not entitled to a new trial.

■ Finally, other impressively incriminating evidence adduced at trial was sufficiently corroborative of defendant's guilt so that even if admission of the Las Vegas statement was error, it was harmless, Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 2d 284 (1969). Fed.R.Crim.P. 52. Evidently the jury found credible the testimony that defendant was stopped in a vehicle belonging to his parents which contained four suitcases holding approximately 56 kilo bricks of marijuana. The defendant at trial admitted these physical facts but denied knowledge of the suitcases and their contents. After being advised of his rights, defendant was asked how much marijuana he had and replied, "I don't know, about 40 or 50 bricks." The government showed further that the quantity of marijuana was clearly far in excess of an amount one would have on hand for personal use. This evidence was of itself sufficient to show definite knowledge on the part of defendant concerning the presence and possession of the contraband.

Accordingly, defendant's motion for a new trial is denied in all respects.

So ordered.