## Donald Wayne KERR and Pat PINNELL
### *v.* STATE of Arkansas

CR 73-161                                    512 S.W. 2d 13

Opinion delivered June 17, 1974
[Rehearing denied July 22, 1974.]

*Murphey, Carlisle & Taylor,* for appellant Pinnell and *Parker & Kincannon,* for appellant, Kerr.

*Jim Guy Tucker,* Atty. Gen., by: *Alston Jennings Jr.,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. This is a conspiracy case. Appellants, Donald Wayne Kerr and Pat Pinnell, were charged by Grand Jury indictment with the crime of Assault with a Deadly Weapon, a misdemeanor, allegedly committed on January 17, 1972, on Charles Ledbetter, the indictment charging that appellants, along with Hayden McIlroy, Jr., "did unlawfully assault Charles Ledbetter with a steel chain with the unlawful intent then and there to inflict bodily injury upon the said Charles Ledbetter, in that said defendants conspired with and otherwise aided, abetted, assisted, advised and encouraged each other, and others, in the perpetration of the assault, and after the assault had been perpetrated, conspired with and otherwise aided, abetted, assisted, advised and encouraged each other, and others, to conceal the identities of those persons responsible for the assault."

A severance was granted to McIlroy and he is not involved in the case presently before us. On trial, the jury returned a verdict of guilty as to both appellants and the punishment of Pinnell was fixed at a sentence of one year in the Sebastian County Jail and the payment of a fine of $1,000, while the punishment of Kerr was set at a sentence of six months in the Sebastian County Jail and a fine of $500.00.

From the judgment entered in accordance with this verdict, appellants bring this appeal. For reversal, Pinnell relies upon four asserted errors while Kerr urges two alleged errors. To understand the case, it is necessary to give the background. Charles Ledbetter, a Fort Smith attorney, was assaulted with a steel chain soon after leaving his office about dusk on January 17 and was rather severely beaten. Ledbetter testified that he saw his assailant, but did not know him. Ledbetter represented Mrs. McIlroy in a child custody case, and without detailing the reasons set forth in his testimony, suffice it to say that Ledbetter had cause to believe that the assault upon him was a result of his representation of Mrs. McIlroy. After a police investigation, Glen Weston Chamblee was arrested and charged with the assault. At the time of his arrest, Chamblee was carrying a pistol, and he was also charged with that offense. On trial, Chamblee was convicted of both offenses and sentenced to 90 days in jail and a $250.00 fine for carrying a prohibited weapon and was sentenced to one year in the Sebastian County Jail and fined $1,000 for the assault upon Ledbetter.

At the trial of appellants, Chamblee testified that, while in jail serving his term for carrying a prohibited weapon, he decided that the best thing for him to do was to tell the officials all the details relating to the assault of Ledbetter. 'Well, after I'd been in there awhile, and I saw that they [meaning McIlroy and Pinnel] weren't doing anything for my family, really, you know, it got me worried because, you know, if they was gonna take care of me, they could take care of my family, and then I had these people that, well, not different people, some of them that knew, had a good idea I was guilty, that told me that the best thing I could do was just to clear my name and get it over with, and *** " He said the money for his defense had been raised by his father mortgaging his house for $5,000 and that he decided the best thing to do was "just clear my name and get it over*** Well, a man come up to visit me I knew and I told, asked him to go to the Prosecuting Attorney, Mr. Bill Thompson then, and tell him I would like to talk to him, and he went down and told him and they sent for me. It wasn't right away. It was about a week or so, I think, maybe."

Chamblee said that he talked with the prosecuting at-

torney, giving the details that linked appellants to the conspiracy; that he offered to help in obtaining evidence to clear up the case, and about two months after making this offer, he was released from jail for the purpose of conducting undercover work which would be of aid to the police officials; that he was not promised any sort of reward for his aid, and that it was done voluntarily and at his own suggestion.

From the witness stand, Chamblee testified that in May of 1971, he was working with the appellant, Donald Wayne Kerr, the two being salesmen selling sewing machines, and stereos. He said that they worked with each other every day and went out at night together to bars. According to the witness, around the first of January, 1972, he told Kerr that he needed money pretty much and the latter replied, "Well, I got a job coming up I think maybe you can handle it for me, if you will." He testified that Kerr just said something about having a lawyer that "needed working over." No details were given for about a week and Chamblee was then told that the lawyer's name was Charles Ledbetter, an attorney of Fort Smith and, "he told me he'd pay two hundred dollars just to beat up, not kill him or anything, just work him up good. He said, 'Let him know he is being beat up for a purpose. He'll know what it's all about, ***.' About the end of the weekend, he come up and ask, told me the job was gonna have to be done. That if it wasn't done, they was gonna bring someone else in from out of town to take care of it." The witness said he followed Kerr's directions and when he struck Ledbetter, told the latter, "Next time, it will be worse." The witness testified that he saw Kerr the next day and told the former that the job had been taken care of; that Kerr left, returned with the $200.00 and paid him. A few days later, according to Chamblee, Kerr told him that he (Kerr) had received a phone call and that "we've got something to do. We've got to go back up a man in Van Buren. So, we went over there to Pat Pinnell's chicken hut place he had over there and went in." Chamblee said that Pinnell supposedly owed some money to someone who was looking for him, and Pinnell desired someone to "back him up" in case that person arrived. Further, "When I walked in, Donald Wayne said, 'This is the man that did a job for us,' and Pat Pinnell shook hands with me and everything, and gave us something to eat, and we hung around there for a while and then Donald Wayne left."

Chamblee said that Pinnell looked pleased when told he was the one who had "done the job." The witness said that a few days later, he learned that the police were looking for him, and he mentioned this to Kerr who told him if he got into any trouble, to call a certain lawyer. Kerr said, according to Chamblee, "Everything will be taken care of, we will get you attorneys and everything, bond fees if anything does happen." He said that he was arrested and spent two weeks in jail before making bond. Chamblee testified that Pat Pinnell called him on the phone, stating that he wanted to talk with Chamblee and an agreement was made to meet at the Iron Horse Restaurant. Upon meeting, he entered Pinnell's car and they drove around, having a long conversation. At this time, Pinnell gave him $200.00 to help "hold me over." He said Pinnell told him that the lawyer he had wasn't very good; that he ought to get another one. Just prior to this meeting, the witness stated he had talked to Kerr who told him the man the job was done for was a banker named McIlroy. "You might need the name sometime in case something happens." He said that he mentioned this name to Pinnell who said nothing. Chamblee stated that he had spent $3,500 on an attorney and was told by Pinnell that he would get his money back when it was all over with. When asked if Pinnell told him specifically why he had engaged in the scheme to assault Ledbetter, that appellant replied:

> "He said that he owed the bank up there eight thousand dollars, and he said that this was his way of keeping him from having to pay it back so much. He said that he went up and told the guy that the job had been done and he, his reactions was, he said, 'I don't want to hear about it.' He said it made him real nervous."

Thereafter, Chamblee was convicted and made the proposition to the Sebastian County Prosecuting Attorney as hereinbefore related. In compliance with that offer to aid, a body transmitter, or "bugging device" was placed on the witness, "A thing they put inside me that could be picked up by tape recorder." After experimenting with the device, he contacted Pinnell by telephone and an arrangement was made to meet at Creekmore Park. The conversation of the meeting was recorded on tape, subsequently transcribed, and Chamblee identified it as properly reproducing the conversa-

tion. Another meeting was likewise arranged with Pinnell at the same location, and again the conversation was taped, part of it taking place at the picnic table, after which the parties sat in Pinnell's automobile and talked. These meetings were viewed, and the recording equipment operated, by Captain James Neighbors of the Arkansas State Police, Bob Hatfield, a City Detective of Fort Smith, and the prosecuting attorney, who were secluded within 50 feet of the two men. Pictures of the two were also taken at the time. After the first meeting between Chamblee and Pinnell, the former turned over to the officers $200.00 which he said was given to him by that appellant. On a third occasion, when no tape was made, there was another meeting between Pinnell and Chamblee, prior to which Chamblee was searched and determined to be without large bills. Following the meeting, Chamblee turned over two $100.00 bills to Officer Hatfield, which he testified had been given him by Pinnell. There is no need to fully detail the recorded conversations between the two which were rather lengthy. Chamblee was complaining that he needed money to obtain another lawyer and Pinnell asked about a "couple of hundred to kind of start you off." Pinnell mentioned that if he obtained the money, the officers were going to ask Chamblee where he received it and the latter replied, "I can always come up with something." Pinnell stated that when Chamblee had been sentenced to the County Jail, he (Pinnell) couldn't do a thing; couldn't visit Chamblee; couldn't contact anyone about him, and he hoped that Chamblee understood. From the record:

"Pinnell: I mean I just couldn't come running, you know, just out like here, this is fine, but I don't want them to start putting anything together, they already know the story. All they need is for you just to go tell them something. And if this were to happen, what's it going to benefit you - 'cause then you got me in trouble, which really, I don't know what I couldn't beat the charge because my association throughout the whole thing was not with you, it was with another man and when that man gets into it, I don't know, have you been talking to Donald Wayne?

Chamblee: No, I haven't seen him.

Pinnell: Well, I think you made a real bad move, I think you should have come and tried to find me and let me see if I couldn't help you on this thing, \*\*\* So, if I were you I'd think about going out of town and working for someone.

Chamblee: That's what I want to do.

Pinnell: All right, now, I would just start inquiring, you know. I don't know who you're going to talk to because there ain't nothing I can do. I can't go fight for you. You know what I mean. Because then it draws me into the thing and then we're all in trouble. I hate to put you into a position to have to face all this heat and if you can come up with another solution, tell me and I'll be happy to try to work it out. \*\*\*
I'm not going to leave you out in the G— d— cold and not only help you but I'm going to do everything I told you I was going to do, but, —, you can't go running to all these other people and then come to me and expect me to like it, you know. I know what you're faced with, but also I'll tell you, if you'll depend on me, I'll work it out for you someway \*\*\*
And, hell, I'm even working on a deal. Remember I told you that I was going to set you up so you'd have a pretty good damn deal after this was all over with. Well, —, I'm working on it, I've almost got it set up and I think I can get you into a hell of a deal. It might be kind of shabby to start off with, but it'll be shabby for me because I'm going to be in there with you. If you want to work with me and it ain't going to be no illegal stuff, it'll be right down the middle and we'll have to work our —off but I think in five years, we might be worth several hundred thousand dollars out of it. \*\*\*
But, damn, you haven't said nothing to anybody, I hope. I'll tell you I sure would hate to see this thing messed up right now because G— d—, I'm looking at a proposition where we can really make some money, if you want to. \*\*\*
Well, I hope that I've eased your anxieties a little bit - just ease by the house any evening, you know, just keep me posted on what's going on. And I might be able to do a little, you know, something on the side somewhere to

help you out. —, I want to see you out of this mess, too. I know that it's tearing you and your family and everything else up, but, hell, look at it from this point of view that if you - say they were to offer you an immunity if you would cop out on the other people involved in this thing, and you said, well, all right, I'll do that, then, where does that leave you?''

The above quoted excerpts are all taken from the first recording. During the second recorded conversation, Pinnell mentioned that the lawyer (not involved in the trial presently before us) who had represented Chamblee told him (Pinnnell) that Chamblee had "copped out on you, told them everything." Chamblee denied this, but stated that he did tell his lawyer the whole story because the attorney told him that he would not be able to help him unless he told him all the facts.

Pinnell then asked if the lawyer took down what was being said or if Chamblee signed anything or if there was any tape recorder. Chamblee replied in the negative to which Pinnell said:

"G— d—! I sure wish you hadn't done that, see, 'cause what he'll probably do now is go up and tell them that you told him the story and convince the Prosecuting Attorney that would be enough evidence to arrest me and my story is that I don't know a G— d— thing about it, I don't care what anybody says to me, I don't know anything about it***
Well what would wind up would be, you and I, we'd be getting put in the penitentiary and everybody else would be laughing at us, so if you want company and you cop out and I go with you (chuckle) but you know if we can kind of keep it cool, if we can just - if you could just buck up and stand the heat, I'm sure that like I tell you, the things that I'm telling you, everything will work out. ***
You see, here's the thing, I can't say anything to you because now I'm in a position that I could be drug in, you understand, since you told Shaver [the lawyer who represented Chamblee on trial], if they drop the case and had a retrial, I'm liable to be called in. If I told you something, then they might talk you into telling them

that, see, where in the hell is that going to leave me. I mean I can't tell you anything, you're just going to have to - when you ask me something, I'll say I'll try to take care of you, you're just going to have to rely on what I say, you know, I mean because if I don't ever say it to you then you can't say I said it, is that right? *** I don't want to be arrested, you didn't want to be arrested to begin with, if you bring me into it, here comes Donald Wayne, you understand, because I did no business with anybody as far as you're concerned, all that you know about me is hearsay, up to now, right. Except that I've given you some money which I would deny that, too.

Chamblee: Where is Donald Wayne now?

Pinnell: I don't know, I haven't seen him or heard from him. I don't know how you ever got arrested. No. 1, I didn't say anything to anyone. I'm sure you didn't say anything to anyone. I know that Leo wouldn't say anything to anyone, so that only leaves Donald Wayne.

Chamblee: He runs his mouth a lot.

Pinnell: If he said something to someone, then maybe that's the reason they picked you up.

Chamblee: I never could find out how they got my name."

Let us first make mention of the pertinent statutes involved, remembering that the charges constitute misdemeanors. Ark. Stat. Ann. § 43-2116 (Repl. 1964) provides that in misdemeanor cases a conviction may be had upon the testimony of an accomplice.

Ark. Stat. Ann. § 41-118 (Repl. 1964) provides that the distinction between principals and accessories before the fact is abolished, and all accessories before the fact shall be deemed principals; said section also provides that in case of a felony, one indicted as principal may be convicted as an accessory after the fact, and if indicted as accessory after the fact, may be convicted as a principal. Of course, all participants in a crime constituting a misdemeanor are guilty as

principals. See *Dickson* v. *State*, 230 Ark. 491, 323 S.W. 2d 432, and cases cited therein.

Ark. Stat. Ann. § 41-120 (Repl. 1964) defines accessory after the fact as follows:

"An accessory after the fact is a person who, after a full knowledge that a crime has been committed, conceals it from the magistrate, or harbors and protects the person charged with or found guilty of the crime."

Ark. Stat. Ann. § 41-2804 (Repl. 1964) provides:

"Every person who shall by bribery, menace, or other unlawful means, directly or indirectly, induce or attempt to induce any witness to absent himself, or avoid a subpoena or other process, or to withhold his evidence, or shall deter or attempt to deter him from offering or giving evidence in any cause, matter or process, civil or criminal, shall, on conviction, be adjudged guilty of a misdemeanor, ***."

The statute relating to the crime of assault with a deadly weapon, of which these appellants were convicted, provides for a punishment of a fine of not less than $50.00 nor more than $1,000, and imprisonment not exceeding one year.

Let us first discuss the contentions of Pinnell. The evidence of Chamblee and the tape, pertinent portions heretofore related, certainly furnish substantial evidence that Pinnell attempted to influence Chamblee and to deter him from giving any evidence relative to other participants in the conspiracy to assault Ledbetter. Promises were made in an effort to placate Chamblee; money was furnished; and it is quite obvious from the tapes that Pinnell was endeavoring to the utmost to prevent Chamblee from "copping out" or saying anything that would aid the authorities in learning the identity of participants (other than Chamblee) in the conspiracy. In fact, as reflected in the tape, he did not even tell Chamblee some of the details, stating that the latter could not possibly tell the police if he didn't know himself. As stated, the evidence of Chamblee and the tape were ample for the jury to find that Pinnell was an accessory, and, this being a misdemeanor case, accordingly guilty as a principal. In fact,

there is no contention on the part of Pinnell that the evidence is insufficient; rather, the asserted grounds for reversal are based upon four other points which we proceed to, discuss.

It is first asserted that the two intercepted oral communications between Chamblee and Pinnell were illegally obtained and their admittance into evidence was reversible error, it being contended that provisions of the Federal Omnibus Crime Control Act, 18 U.S.C.A. § 2510, et seq., were not followed. We do not deem it necessary to discuss the various provisions of that act, for we are of the opinion that under § 2511 (2) (c) the evidence was admissible. That section provides:

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

But, says appellant, this section has no application to the case at hand because the cooperation, or consent given, by Chamblee to participate in the communication, was not voluntary. It is argued that Chamblee (at the time this case was heard) had not served any of his sentence for the assault on Ledbetter, nor paid any part of his fine, but had only served his sentence for carrying the pistol. We do not agree that this fact establishes involuntariness on the part of Chamblee. That witness himself testified very positively that he, of his own accord, and somewwhat influenced by the fact that his family was not being taken care of by his alleged co-conspirators, and desiring, as per the old saying "to get it off his chest", sent word to the prosecuting attorney that he (Ch: nblee) desired to see him; that about a week later that official sent for Chamblee and they engaged in conversation. He said the prosecuting attorney made him no promises whatsoever, and he was returned to the jail to continue serving his sentence. About two months later, Chamblee said that he was released from jail, made bond and plans were made for him to assist in the investigation. We are of the opinion that the evidence supports the State's position that Chamblee acted voluntarily.

The argument just discussed is the principal one advanced by Pinnell, though it is also mentioned that the prosecuting attorney should have obtained a prior court order authorizing the interception of the two conversations. This contention is contrary to the holding in *United States v. White*, 401 U.S. 745.

It is next argued that, assuming the transcriptions were legally obtained, they were admitted in error due to the procedure of introduction and prejudicial content. Here again, we find no merit in appellant's argument. The contention is that the court should have listened to the tapes out of the presence of the jury, giving counsel an opportunity to object to illegal, irrelevant, incompetent, or immaterial matters contained therein. The short answer to this contention is that counsel for Pinnell filed a motion for discovery and inspection requesting a copy of, and inspection of, all written or recorded statements made by this appellant. The court's order, dated May 5, 1973, reflects, "the state asserts that it has, or will, deliver to defendants' counsel all records statements of such defendants and make available to counsel for defendants the original tapes of the statements of defendants and such motion with respect to the furnishing of defendants their statements to be used by the state is granted;".

The court also granted a motion with respect to the State's furnishing to the defendants evidence in the State's possession favorable to defendants, directed that defendants be furnished a list of witnesses that the State intended to call, and also granted the motion with respect to obtaining a bill of particulars. It thus appears that appellant Pinnell had ample time in which to acquaint himself with the contents of the tapes, and to make any further motions with regard to the objections heretofore mentioned. This was not done.

It is also mentioned that the statements made by Pinnell which were recorded were in the nature of a confession and that his appellant was accordingly entitled to a *Denno* hearing[1] before such tapes were presented to the jury, in order to determine if the statements were voluntarily made. We do not agree that the recorded statements of Pinnell were

---

[1] *Jackson v. Denno*, 378 U.S. 368 (1964).

a confession and it is very obvious from reading the transcriptions of the tapes that all statements were voluntarily made. This was simply a matter of "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." See *United States* v. *White, supra,* and cases cited therein. Of course, had Pinnell known that his remarks were being recorded, we daresay such statements would not have been made, but this fact has nothing to do with whether they were made freely and of his own accord. After all, Chamblee could have testified concerning his conversation with Pinnell, and did in fact testify to quite a bit of the conversation. The tape recording was simply the best possible evidence of the conversations and cooroborated the testimony of Chamblee himself.

It is next asserted that Pinnell's trial counsel, Darrell Johnson, conducted himself in such a manner as to deny Pinnell the right to counsel guaranteed by the Sixth Amendment. This contention should be discussed together with the fourth asserted error, viz., "The trial court erred in not granting a continuance so that appellant could obtain competent counsel and/or in not appointing competent counsel at trial." The record reflects that this attorney was obtained by Pinnell more than six months before trial and several motions were filed by Johnson before the trial, the first being in December, 1972, and the last in May, 1973. When the case was called on June 25 (a Monday), the court inquired if the parties were ready. The State replied in the affirmative and Johnson then asked to approach the Bench and conferred with the court out of the hearing of the jury. Counsel stated that he had turned his file over to present counsel for Pinnell, who are conducting this appeal, on the previous Thursday or Friday. Johnson then stated:

> "I don't even have the file. He [Carlisle] said he was going to give it to Mr. Pinnell. Now, it's my understanding, you got a copy of my letter. I know you just got it or barely did have time to read it, but I am in a very awkward position, Your Honor, it's been my very valid impression for at least thirty to forty-five days that I wasn't involved in this matter. I was even reassured of that in the middle of the week by the fact Mr. Carlisle talked to me about it and talked to the prosecuting at-

torney about it. And of course, I guess he explained his position in the thing, but I am thrown back into this thing not having prepared or anything else and I know that the Court may feel that I don't have any excuse, but believe me, I do. I didn't, the defendant doesn't even have a telephone where he can be contacted. I don't know where he lives and I was in Little Rock all day Saturday. Late Friday it was my impression, Mr. Carlisle, late Thursday Mr. Carlisle represented Mr. Pinnell. It's a very serious thing, in that I haven't begun to prepare this case."

The State's attorney responded that he had had only one conversation with any other attorney on behalf of Pinnell and that had been on the previous Thursday afternoon; that he had heard rumors about a guilty plea but never about obtaining any other attorney. The State pointed out that the case had been set since May 4 or 5. Pinnell, after conferring with Johnson, stated to the court:

"Well, I feel the relationship between Mr. Johnson and I has become such that he wouldn't offer any defense for me and, consequently, I tried to have another lawyer appointed for me, and, (Pause) that is the statement. I don't know what else to say."

Actually, there is no request for a continuance in the record, though there is an inference that Johnson might be seeking a continuance; however, he stated:

"All right. Let me ask you for the purpose of making the record, is the court ordering me to try this case? I don't mind either way, but for the purpose of making the record."

The court told Johnson to go ahead and make his record, but apparently nothing further was dictated into the record by the attorney reflecting why he was not ready for trial. While Johnson stated that he had been under the impression for at least 30 to 45 days that he was no longer involved in the matter, no reason was given to the court of why or how he had received that impression; more important, though the case had been set for at least seven weeks, counsel had not ad-

vised the court that he did not any longer consider himself the attorney for Pinnell. As stated, that knowledge only came to the court on the day of trial.

This is a strange and unusual situation indeed and raises questions as to the reason for delay in advising the court; also, there was no reason given by Pinnell why he, three or four days before trial, decided to change attorneys. At any rate, we certainly cannot hold that the trial court abused its discretion in not granting a continuance (which was not actually requested). The trial courts of this State, as in most other jurisdictions, have heavy dockets and, criminal trials, under our rules, are given priority. The State was ready for trial; appellant Kerr was ready for trial; witnesses had been subpoenaed; and the jurors summonsed. Absolutely no reason was given why all parties should not have been ready. Pinnell had selected his own attorney, and if he desired to change attorneys a few days before trial, arrangements should have been made with that attorney to conduct the trial.

Court proceedings cannot be disrupted at the last minute because a litigant decides that he needs a different lawyer to conduct his defense. The appointment of counsel for appellant by the court, under the circumstances, is also suggested under this point. Of course, in the first place, the court appoints counsel only for indigents, and there is no showing that Pinnell was indigent; in the next place, if a man who had been retained for over six months could not conduct a defense, how could newly appointed counsel, totally unfamiliar with the facts, conduct any better defense?

It is likewise argued that no proper defense was conducted, appellant largely averring that witnesses were not properly cross-examined. Of course, there was no necessity to cross-examine Ledbetter since the victim was only able to testify as to the participation of Chamblee in the assault made upon him. The only reference in Ledbetter's testimony to Pinnell was that the victim testified that someone called him on the telephone who said his name was Pinnell, but under subsequent cross-examination by counsel for Kerr, Ledbetter said that he did not know Pinnell's voice and could not definitely say that it was that person speaking, even after

listening to Pinnell's voice on the tape. Johnson's turn to cross-examine followed, but there really was nothing further to ask about.

The two officers were not cross-examined by Johnson, but Neighbors only testified that he "rigged" Chamblee with the body transmitter and listened to the conversation. Officer Hatfield testified that he was also present when the recordings were being made and further testified that Chamblee was examined before one of the meetings with Pinnell, found to have no large bills, but returned from his meeting with that appellant with two $100.00 bills. There really wasn't a great deal about which to cross-examine either officer. Counsel for Kerr only asked Neighbors one question, although his client was mentioned about ten times, such question being if Neighbors had ever seen Kerr present at any time that he (Neighbors) had participated in the investigation of the case, and in his cross-examination of Hatfield, the tapes were mentioned only once. After counsel for Kerr finished his cross-examination, Johnson announced that he had no further questions.

In the cross-examination of Chamblee, counsel for Kerr likewise took the first cross-examination which was rather thorough, and at the conclusion of this cross-examination, Johnson conducted his cross-examination, the interrogation being pertinent to the charge against Pinnell and establishing the fact that the two (Chamblee and Pinnell) had no acquaintance prior to the Ledbetter incident. Perhaps other attorneys could have conducted a cross-examination that would have revealed more facts favorable to their client — perhaps not — but this is not the test. The test is whether the professional conduct of non-appointed counsel is so lacking in competence or good faith that it shocks the conscience of the court or prosecutors, and the trial is reduced to a sham, farce or mockery of justice. See *Franklin and Reid* v. *State,* 251 Ark. 223, 471 S.W. 2d 760, and *Barnhill* v. *State,* 247 Ark. 28, 444 S.W. 2d 97. We do not find that situation to have existed in the case now before us, and the judgment of conviction against Pinnell is affirmed.

We come now to appellant Kerr. Counsel for this appellant moved for a severance, and a hearing was con-

ducted on May 5. At such hearing, the prosecuting attorney indicated that the conversation between Pinnell and Chamblee would be introduced at the joint trial of these appellants. At the outset, the court indicated that it agreed that Kerr was entitled to a severance unless Pinnell's recorded statement could be amended in such a manner as to strike Kerr's name from the recording. No ruling however was made on that date[2]. The motion was subsequently denied and we think, under the circumstances, the severance should have been granted, or references to Kerr should have been deleted from the statement. The trial court did admonish the jury that the statements of Pinnell were not to be considered against Kerr, but this did not cure the error. The situation is somewhat similar to cross-implicating confessions in a joint trial. In *Grooms* v. *State*, 251 Ark. 374, 472 S.W. 2d 724 (1971), this court, after citing several cases, stated:

> "In those cases it was recognized that, in the circumstances, it was no longer permissible to allow cross-implicating confessions in a joint trial. This procedure impinges upon the basic and fundamental right of a defendant to be confronted from the witness stand by his adverse witness with the accompanying right of cross-examination as is guaranteed by the federal Sixth Amendment. Neither could the prejudicial effect of a violation of this constitutional right be removed by a cautionary instruction to the jury that it should not consider as evidence the admission of a confession against a codefendant. It was further recognized in those cases that the problems which might arise from cross-implicating admissions could be resolved by deleting offending portions which refer to a codefendant. Otherwise, the court should grant separate trials."

Here, the court knew in advance that transcripts of the recordings would be offered; that these transcripts referred to Kerr, in one instance, Pinnell stating to Chamblee that "he's [Kerr] the one that handled the whole proposition with you, isn't he, him and Leo." And in another instance, Pinnell stated to Chamblee:

[2]This hearing was conducted by a different circuit judge from the judge who tried the case, both being on special assignment from the Chief Justice of the Arkansas Supreme Court.

"I tell you if I were you I'd stay away from Donald Wayne [Kerr] because if anything ever happens, you know, the boat gets starting to rock - he could inadvertently say something and get everybody in trouble. You know what I mean. And I just wouldn't go around him and bring it up. I'm not knocking Donald Wayne, hell, I like him as well as anybody, but I know how Donald Wayne is and he gets on that grass, there ain't no telling what he's liable to do - and he loves to think that he's got heat on you, you know."

The quote from *Grooms* mentions the violation of a federal constitutional right. Likewise, that same right is provided by our own Constitution, Article II, Section 10, which states that an accused shall have the right "to be confronted with the witnesses against him;" and this right as to Pinnell was not afforded Kerr in this case.

Actually, of course, the evidence of Chamblee himself (if believed by the jury) was ample to convict Kerr, and the additional testimony was not essential to the State's case as to this appellant. Even the State recognizes that there is a "real question as to whether Pinnell's mention of Kerr was prejudicial." We have said on numerous occasions that unless it can be said with certainty that testimony offered against a defendant was not prejudicial, it must be considered prejudicial and the judgment reversed. *Sims v. State,* 252 Ark. 147, 477 S.W. 2d 825.

Summarizing, in accordance with what has been said, the judgment against Pat Pinnell is affirmed; the judgment against Donald Wayne Kerr is reversed and the cause, as to him, remanded to the Sebastian County Circuit Court with directions to proceed in a manner not inconsistent with this opinion.