Rodney Dale REEVES *v.* STATE of Arkansas

CR 75-29 . 528 S.W. 2d 924

Opinion delivered November 3, 1975

*Harold L. Hall*, Public Defender, by: *Ed Hargis*, Dep. Public Defender, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Jack T. Lassiter*, Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant Rodney Dale Reeves was jointly charged and tried with his brother Paul Reeves before a jury upon the offense of possession of stolen property and with being a person subject to the Habitual Criminal Act. The trial court, at the close of the evidence, directed a verdict in favor of Paul Reeves. The jury, having specifically found appellant guilty and that he had previously been convicted of two prior felonies, set his punishment at seven years in the Department of Correction. For reversal appellant makes the contentions hereinafter discussed.

The record shows that on February 18, 1974, a 1951 Chevrolet truck belonging to Leon Fulgham, d/b/a All

Seasons Auto Sales, was stolen from his automobile sales lot. Mr. Cecil Fulgham, Leon's father, who was in the area of appellant's residence at 5322 Free Ferry Road in Fort Smith, Arkansas, on other business, on February 23, 1974, discovered the 1951 vehicle in the back yard of the premises rented by appellant. Mr. Cecil Fulgham, together with his sons, Leon and James, went to the address on Free Ferry Road to investigate. When they arrived they found appellant and his brother Paul working on a Plymouth automobile. Leon asked one of the men if they would sell a Pontiac automobile also on the premises. Appellant replied that he did not want to sell it. Leon then inquired about the 1951 Chevrolet pickup and was told by appellant that he did not want to sell it since it had been in the family a long time. The Fulghams then drove to a public phone booth and called the police. Mr. Danny Phillips, a patrolman with the Fort Smith Police Department, responded to the Fulghams' telephone call. When the Fulghams and Officer Phillips went to 5322 Free Ferry Road they found that neither the truck nor appellant was there. Upon inquiry, Paul Reeves told the officer that appellant had gone to get some cigarettes. When asked where the truck was, Paul asked "What truck?" Not long after Officer Phillips arrived appellant returned driving a Pontiac automobile. When appellant returned Officer Phillips asked appellant where the pickup truck was. Officer Phillips testified that appellant said "he took it over to somebody's house or something." At this time Officer Phillips tried to put appellant in the Police automobile, but appellant refused. The Officer also failed to heed appellant's demand that he and the Fulghams get off of the premises. Officer Phillips at that time called police headquarters for a backup. Appellant went into the house and Officer Phillips followed him, where appellant showed him a title to an automobile, which Officer Phillips determined was not to the vehicle stolen from Leon Fulgham. Officer Phillips, at this time, would not permit appellant to get out of his sight. While appellant was in the house, Officer Lawrence Pfeifer arrived in answer to Phillips' request for a backup. Also, a lady with appellant's children arrived, and, as a result thereof, appellant and Officer Phillips went back outside. While the officers were talking to the lady with the children, Officer Phillips observed appellant removing his billfold and offering

the Fulghams $1,000 in cash "to forget the whole thing." Officer Phillips stopped those negotiations. At that time appellant was placed in Officer Pfeifer's automobile.

Prior to the $1,000 offer to the Fulghams, Officer Pfeifer had also made inquiries of appellant. Officer Pfeifer testified that on the way to the police station, appellant volunteered that he knew he was in trouble and began to explain "about this pickup," and that he would give $1,000 if this man would let him pay for the pickup. At that time Officer Pfeifer gave appellant his *Miranda* warnings, and the only statement made thereafter was that appellant "knew where the pickup was but he was not going to tell anybody."

With respect to searches, the record shows that the officers, without a search warrant and after appellant was in jail, went to the premises about 6:30 p.m. on February 23, 1974, the day of the arrest, examined the premises, and with the aid of a flashlight, looked into an outbuilding at the extreme rear of the residence where they observed two license plates — one of which was on the Fulgham vehicle when it was stolen. A patrolman was stationed on the premises at that time. When appellant's wife returned home about 3:00 a.m. on February 23rd the officers again went to the premises and obtained from the wife a written consent to search the house. Subsequently, upon the information obtained from the first search of the premises with the aid of a flashlight, the officers obtained a search warrant and searched the premises for the third time. On February 28th the officers again searched the premises. A fifth search came on March 1, 1974, when Officer Hampton again went to the premises with some FBI agents and obtained a second written consent to search from appellant's wife.

John Reeves, a brother of appellant, testified that appellant had not been living at the premises for over a year. John also testified that he was the person who stole the vehicle and that he was the person who drove it from the premises immediately after the first visit by the Fulghams. He testified that he told both appellant and Paul Reeves that he paid $400 for the vehicle and that he was the person who made the alterations to disguise the vehicle.

POINT 1. We find no merit to appellant's contention that he was entitled to a directed verdict. The testimony of the Fulghams with reference to appellant's statement about the vehicle being in the family for a long time and appellant's subsequent offer of $1,000 to forget the whole thing, together with the showing that appellant was renting the premises, is sufficient to prevent a directed verdict.

POINT 2. The search made at 6:30 p.m. after appellant's arrest but without a search warrant constituted an unlawful search. Since the search warrant issued and served the following day was admittedly issued upon the evidence obtained in the unlawful search, the evidence obtained therefrom should have been suppressed as being "the fruit of the poisonous tree."

The State contends that the 6:30 p.m. search should be considered permissible because of the exigencies of the circumstances. However, this contention is wholly without merit, see *Jenkins* v. *State*, 253 Ark. 249, 485 S.W. 2d 541 (1972) and *Coolidge* v. *New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

POINT 3. The validity of the consent of the wife to search the residence at 3:00 a.m. on February 24th is moot since no evidence was introduced as a result of the search nor any search warrants issued as a result thereof.

POINT 4. The only other search that produced any evidence was the search of Officer Hampton and the FBI on March 1, 1974. Mr. Hampton says that Mrs. Reeves voluntarily signed the consent to search for purposes of examining some Volkswagens on the premises. Mrs. Reeves testified that she was told that she was signing a consent to search the cars and that she only signed it after she was told that if she didn't sign the consent the officers would get a search warrant. The written consent signed by Mrs. Reeves is much broader and authorized the officers "to search my residence (or other real property located at 5322 Free Ferry Road and my motor vehicle, namely my *N/A* . . . ."

In speaking of when a consent is voluntary or involuntary in *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), this language was used:

". . . We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. . . . "

In *United States* v. *Curiale,* 414 F. 2d 744 (2d Cir. 1969), cited approvingly in *Schneckloth* v. *Bustamonte, supra,* the test for determining the voluntariness of a consent to search is put in this language:

" . . . The resolution of the issue depends on whether his consent was a voluntary, intentional and understood waiver of a known right, or, on the contrary, was the product of deceit, duress and coercion, actual or implicit. . . ."

Under the circumstances we cannot say that the trial court was incorrect in finding that the State had met its burden of showing that the consent was voluntary. It follows that the trial court did not err in refusing to suppress the evidence obtained in the March 1, 1974 search.

POINT 5. The issue here relates to the failure of the trial court to suppress alleged oral statements made by appellant at the scene of his arrest because of the failure of the officers to give the *Miranda* warnings. That such warnings are necessary when an individual is taken into custody at his home is established by *Orozco* v. *Texas,* 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969). As pointed out in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966),

custodial interrogation means not only actual arrest but also any conduct that deprives a person of his freedom of action in any way. Furthermore, as pointed out in *United States* v. *Hall*, 421 F. 2d 540 (2d Cir. 1969), the test is an objective one.

When we view the evidence here from an objective view point, it at once becomes obvious that the investigation had become so focused upon appellant at the moment he returned to the premises that the officers would not let him out of their sight and that they would not obey his command to depart from his premises. The testimony of Officer Phillips that he tried to get appellant into his patrol unit to continue the investigation takes away any doubt to the contrary. Thus, it follows that all statements of appellant made to the officers from the time of his return in the Pontiac to the time that Officer Pfeifer gave the Miranda warnings on the way to jail should have been suppressed.

POINT 6. Appellant suggests that the statements made by him after his arrest should be suppressed on the basis that the arrest was illegal and without probable cause. We find no merit in this contention, for probable cause existed upon the knowledge and information which the Fulghams conveyed to Officer Phillips prior to going to appellant's residence.

POINT 7. The trial court permitted the State to introduce into evidence statements made by Paul Reeves out of the presence of appellant notwithstanding appellant's objection that it violated his constitutional right to be contronted with the witnesses against him. The State's theory at that time was that the statements were made in furtherance of a conspiracy. The State so utterly failed to prove a conspiracy between Paul Reeves and appellant that the trial court directed a verdict for Paul at the close of the evidence. To sustain the conviction now, the State suggests that *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) and *Kerr & Pinnell* v. *State*, 256 Ark. 738, 512 S.W. 2d 13 (1974), are not applicable for each of two reasons: (1) Appellant did not request a severance and thereby waived the right to confront the witnesses against him; and (2) When Paul Reeves was discharged by a directed verdict after the close of the evidence, appellant should have called him for

purposes of cross-examination. We find no merit in either contention for the simple reason that under the Sixth Amendment to the United States Constitution the burden is on the State to confront the accused with the witnesses against him. It follows that the trial court erred in permitting the officers to testify to the statements made to them by Paul Reeves.

POINT 8. In proving prior convictions on the habitual criminal charge it was admitted by appellant that he had one prior felony conviction and that if the clerk of the court were called he would testify that the docket sheet kept in his office showed that appellant had pled guilty to a second conviction. We agree with appellant that the docket sheet cannot be used to supply a deficiency in the records and that the trial court erred in permitting the docket sheet to be used to show a prior conviction. See *Hollaway* v. *Berenzen*, 208 Ark. 849, 188 S.W. 2d 298 (1945).

Neither do we find any merit to the State's contention that appellant's testimony given at his motion to suppress hearing should be used for purposes of making the State's failure of proof a harmless error.

Reversed and remanded for new trial.

HARRIS, C.J., and FOGLEMAN and JONES, JJ., concur in part and dissent in part.

CARLETON HARRIS, Chief Justice, concurring in part, dissenting in part. I concur in the result reached in this case for reasons set out in the majority opinion, except that I cannot agree with the majority in the conclusions reached under Point 5, *i.e.*, "that all statements of appellant made to the officers from the time of his return in the Pontiac to the time that Officer Pfeifer gave the *Miranda* warnings on the way to the jail should have been suppressed."

I agree with Justice Fogleman's dissent in this respect, and accordingly dissent myself to the holding under Point 5.

JOHN A. FOGLEMAN, Justice, concurring in part, dissenting in part. Except for the matters set out in this separate

opinion, I concur in the majority opinion. I do not agree that any statements made by appellant after his return to the premises until the Miranda warnings were given were inadmissible.

We must remember that the trial court found them admissible on motion to suppress. While we make an independent determination of voluntariness based upon the totality of the circumstances, we will not reverse the trial judge on his finding unless it was clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515. It must be remembered that the exclusionary rule applies only to statements resulting from custodial interrogation. Rodney Reeves came back to the premises where he lived while the officers were trying to ascertain the whereabouts of the truck the Fulghams had claimed they saw on the premises. When asked about the truck by Patrolman Phillips he said he had taken it to someone's house and parked it. When asked for the title to the vehicle, he said that it was in the house. At some point, he ordered the officers off the premises. It may have been as early as his arrival there and it may have been as late as the request for the title. At any rate, his freedom had not been restricted in any way and the inquiry was purely investigatory and proper until the officer refused to let Rodney go into the house without accompanying him, after these statements had been made. *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974 (1965); *Johnson* v. *State*, 252 Ark. 1113, 482 S.W. 2d 600; *Patrick* v. *State*, 245 Ark. 923, 436 S.W. 2d 275; *Stout* v. *State*, 244 Ark. 676, 426 S.W. 2d 800.

En route to the police station, Rodney began to try to explain and said he knew he was in trouble, and officer Pfeifer remarked that he wouldn't be in any trouble if he told them where the pickup was. Rodney said he wasn't going to tell them anything and then said he would give $1000 if the man would let him pay for the truck. Pfeifer then warned Rodney of his rights and Rodney then said he knew where the pickup was but wasn't going to tell anybody. Rodney did testify that Pfeifer asked him during the trip to the police station, "Where in the hell is that truck?", before advising Rodney of his constitituional rights, and that he answered that it was

probably in Oklahoma. According to Pfeifer, he asked Rodney where the pickup truck was after Rodney had been advised of his constitutional rights and Rodney said he knew or felt like it was in Oklahoma but did not know where and wouldn't tell who took it there.

The exclusionary rule does not apply to voluntary statements and statements made without coercion following the proper advice as to constitutional rights. *Miranda* v. *Arizona,* supra; *U.S.* v. *Joslyn,* 371 F. Supp. 423 (D.C. Az. 1974); *Hale* v. *State,* 252 Ark. 1040, 483 S.W. 2d 228; *O'Neal* v. *State,* 253 Ark. 574, 478 S.W. 2d 618; *Blanton* v. *State,* 249 Ark. 181, 458 S.W. 2d 373.

Certainly we cannot say that the finding of the trial judge was clearly against the preponderance of the evidence, on statements made before his freedom was restricted and statements made after the warnings were given.

*Ozorco* v. *Texas,* 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969), cited by the majority, does not require the exclusion of these statements. The statements there all resulted from interrogation while the accused was in custody and he had not been warned of his constitutional rights. They were elicited by four police officers who entered the accused's bedroom in a boardinghouse at 4:00 a.m. One of these officers testified that the accused was not free to leave from the time they entered his bedroom. That is a decidedly different situation.

I also cannot agree that a docket sheet is not admissible in evidence to show a previous conviction. Ark. Stat. Ann. § 43-2330 (Repl. 1964) does not purport to make the certified copy of a former conviction and judgment the exclusive method of proof. Until notations on a docket sheet are controverted they are prima facie evidence. *Prout* v. *State,* 256 Ark. 723, 510 S.W. 2d 291; *Smith* v. *Wallis-McKinney Coal Co.,* 140 Ark. 218, 215 S.W. 385; *Visart* v. *Bush,* 46 Ark. 153. I would not, however, disagree with the holding that it was not admissible in this case. There was no conviction and judgment for imprisonment in the penitentiary in this instance. Appellant was put on statutory probation. This could not

come within the terms of Ark. Stat. Ann. § 43-2330. Furthermore, we have held that there is not a conviction until there is a commitment to prison. *State Medical Board* v. *Rodgers*, 190 Ark. 266, 79 S.W. 2d 83; *Tucker* v. *State*, 248 Ark. 979, 455 S.W. 2d 888; *Sutherland* v. *Arkansas Department of Insurance*, 250 Ark. 903, 467 S.W. 2d 724. The probation may well account for the fact that no judgment was ever entered of record in the case.

As to all other matters, I fully concur.

I am authorized to state that Mr. Justice Jones joins in this opinion.